1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     **HONORABLE DALE S. FISCHER, JUDGE PRESIDING**

5                    ---

6  UNITED STATES OF AMERICA,      :
                                  :
7          PLAINTIFF,             :
                                  :
8      VS.                        :   NO. CR 07-414-DSF
                                  :
9  DANIEL OSAZUWA,                :
                                  :
10         DEFENDANT.             :

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             JURY TRIAL - DAY 1

16          LOS ANGELES, CALIFORNIA

17        TUESDAY, NOVEMBER 17, 2009

18

19

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

1 | **Appearances of Counsel:**

2

3 | For the Plaintiff:

4 |        Office of the United States Attorney
       By Angela Sanneman, AUSA

5 |        312 North Spring Street
       Los Angeles, CA 90012

6 |        (213) 894-2434

7

8

9 | For the Defendant:

10 |        Office of the Federal Public Defender
       By Richard Goldman, DFPD

11 |        321 East Second Street
       Los Angeles, CA 90012

12 |        (213) 894-2854

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3    JURY VOID DIRE.......................................... 16

4    OPENING STATEMENT BY COUNSEL FOR THE GOVERNMENT........116

5    OPENING STATEMENT BY COUNSEL FOR THE DEFENSE...........122

6    **OSCAR MEDINA,** SWORN...................................129

7    DIRECT EXAMINATION BY MS. SANNEMAN.....................129

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **Los Angeles, California; Tuesday, November 17, 2009**

2                              **8:42 A.M.**

3          THE COURT:  You've given me a Proposed Jury

4    Instruction that states you've heard evidence that the

5    defendant has been tried before.

6          Did you want me to wait until the end and see if

7    that actually occurs, or did you want me to say something

8    about that in advance?

9          MR. GOLDMAN:  I don't think the Court should say

10   something about it in advance.  I'm not even sure that it

11   should be given or will be given.  I just don't know how the

12   evidence will play out.

13         THE COURT:  Okay.

14         MR. GOLDMAN:  Your Honor, can I confer with

15   Ms. Sanneman?

16         THE COURT:  You may.

17         MR. GOLDMAN:  Your Honor, basically, with respect to

18   the exhibits that I've given Ms. Sanneman, I think she agrees

19   to all of them save for -- I can tell you which ones.  I don't

20   think she disagrees as much as she has just a question about

21   them.

22         MS. SANNEMAN:  And, your Honor, I was looking last

23   time at the transcript, and it looks like the reports that

24   were written by the officers about the incident, the Court

25   ultimately concluded that those were business records because

5

1    they were made in the regular course of business, et cetera,

2    and as that was the law of the case, then the government

3    wouldn't oppose that for the ones that came in last time.  It

4    looks like defense counsel wants to get in a few more of those

5    reports by other officers.  I mean, I think the Court's ruling

6    would be the same on those.  They were all made at the same

7    time, which is why the government wouldn't oppose.

8              THE COURT:  Okay.

9              MS. SANNEMAN:  Okay.  There are a lot of 302's by

10   the FBI in here, and that would be Agent Treacy taking notes

11   of what someone else was telling him when he was

12   investigating.  And I believe those would all be hearsay, and

13   they are police reports and would all be excluded except for

14   purposes of impeachment of whoever Agent Treacy was talking to

15   at the time.

16             THE COURT:  Well, they are not exhibits in any

17   event.

18             MS. SANNEMAN:  Right.

19             MR. GOLDMAN:  They are marked for identification,

20   your Honor.  And I would have the witness refer to them, but

21   with respect to seeking to have them entered, I don't think I

22   will.

23             THE COURT:  Okay.

24             MR. GOLDMAN:  Only for purposes of impeachment.

25   Please look at Defense 1.  What is it?  Just for impeachment

1    purposes.

2              MS. SANNEMAN:  And the same of Agent Treacy's notes.

3              MR. GOLDMAN:  See those in here, too.

4              THE COURT:  Okay.

5              MS. SANNEMAN:  And so I think that -- and then, of

6    course, there are lots of pictures and whatnot.  They are all

7    of 5 North.  I recognize that.  So I'm not concerned about

8    those.

9              The ones I would have a concern about, just because

10   I don't really know how they were generated, was Exhibit 19,

11   which I think is some sort of medical report about Officer

12   Medina by his doctor.  So I'm not sure.  I don't think his

13   doctor is testifying, unless I'm wrong.

14             MR. GOLDMAN:  No, your Honor, and I wouldn't seek

15   to -- only to refer to it for impeachment purposes.

16             MS. SANNEMAN:  Okay.  Now, Exhibit 20 came in last

17   time.  So again, law of the case, I wouldn't oppose it.

18             Exhibit 21 is something called a program review

19   report, and it's about the defendant.  But I'm just not sure

20   who made it or what it is.

21             THE COURT:  Are they all in this book that I have?

22             MR. GOLDMAN:  They are, your Honor.

23             MS. SANNEMAN:  And that's --

24             MR. GOLDMAN:  Your Honor, essentially it would be

25   Exhibits 21 through 24.  Those were the exhibits.  These

1    exhibits were in the discovery that the government turned over

2    to me.  And this information is information that is generated

3    at the MDC on a regular basis with respect to inmates, with

4    respect to classification, with respect to information that

5    they have collected about the inmates.

6              And so I would propose to introduce these exhibits

7    through one of the witnesses.  They were kept for every inmate

8    in the regular course of business, and I'm confident that it

9    satisfies 803-6, the business records exception to the hearsay

10   rule.

11             THE COURT:  Is the objection authenticity or

12   relevance?

13             MS. SANNEMAN:  It would be relevance until I hear.

14   And also I just don't know who is going to authenticate that

15   and talk about the fact that they were produced in the regular

16   course of business.  I haven't asked any of my witnesses about

17   them.  But he very well may be able to.

18             THE COURT:  Okay.

19             MS. SANNEMAN:  But other than that...

20             MR. GOLDMAN:  The government has handed me their

21   exhibits, your Honor.  They attached in their exhibit book the

22   transcripts.  And so obviously, I don't have an issue with

23   that, and I just want to.

24             MS. SANNEMAN:  Your Honor, the government is not

25   seeking to have the transcripts sent back to the jury.  It

1   would be similar to what Mr. Goldman is doing for impeachment

2   purposes in that the government would refer to them and read

3   from them.

4           THE COURT:  Okay.  I have three transcripts, and I

5   have the defense exhibit.

6           MS. SANNEMAN:  The Court's book is here.  I

7   apologize.

8           THE COURT:  I've changed the seating order, as you

9   might have noticed, Mr. Goldman, or not.  So hopefully, I

10  don't get as confused as I got the last time when we selected

11  the jurors.

12          MR. GOLDMAN:  Your Honor, I looked at the

13  government's exhibits.  I don't have any objection to them.

14  So when the government offers their exhibits --

15          THE COURT:  All right.

16          MR. GOLDMAN:  -- I'm in with all of them.

17          THE COURT:  That's fine.  Thank you.  One alternate

18  enough?

19          MR. GOLDMAN:  I think so, your Honor.

20          THE COURT:  We're talking about two or three days?

21          MR. GOLDMAN:  At the most, your Honor.

22          THE COURT:  Okay.  Anything else we should talk

23  about?

24          Ms. Plato, I think you can let them know that we're

25  ready for our jurors whenever they can get them here.

```
 1              THE CLERK:  Certainly, your Honor.

 2              MS. SANNEMAN:  Your Honor, I don't know if this is

 3    the time to talk about these issues or if you'd like to do it

 4    later.  We did have one outstanding jury instruction that we

 5    needed to resolve, but maybe that's for a later time.  With

 6    regard to what one of the witnesses is going to testify to

 7    that I was planning to use in my opening, and I wanted to make

 8    sure defense counsel didn't have a problem with it.

 9              Would you like to talk about that now?

10              THE COURT:  Sure.

11              MS. SANNEMAN:  Physician's Assistant Castillo

12    testified last time and will probably testify again that the

13    defendant, when she asked what happened, the defendant said,

14    "God in Hollywood made me do it."  Defense counsel mentioned

15    to me before that he was thinking of maybe questioning that on

16    relevance or 403 grounds.  I was planning on using it in my

17    opening.  He didn't move with regard to that statement.  I

18    just wanted to make sure I don't -- he doesn't have a problem

19    with me saying it in my opening.

20              MR. GOLDMAN:  Your Honor, my issue, and I had spoken

21    to Ms. Sanneman about this before, was that the statement

22    attributed to Mr. Osazuwa as vague.  God in Hollywood made me

23    do what?  She doesn't say that Mr. Osazuwa would say God in

24    Hollywood made me attack Mr. Medina.  She just says

25    Mr. Osazuwa says God in Hollywood made me do it.
```

1          So I thought well, because it's vague, because it

2     permits the jury to speculate as to what he did, I thought

3     that it would be properly excluded based on Federal Rule of

4     Evidence 402 and Federal Rule of Evidence 403.

5          THE COURT:  All right.  Well, the jury will consider

6     it in the context of all of the other evidence they have, and

7     they will be able to decide -- or whether they can determine

8     what in fact it relates to.  So on balance, I don't think it's

9     more prejudicial than probative, and it is relevant.  So I'll

10    allow it.

11         MR. GOLDMAN:  Very well, your Honor.

12         MS. SANNEMAN:  Does the Court typically ask the

13    jurors if they have had any prior jury service, and if they

14    have --

15         THE COURT:  There's a whole separate sheet.

16         MS. SANNEMAN:  Oh, sorry.  Okay.  Thank you.  And

17    then lastly, I put this in my trial memo.  The defense wants

18    to call several witnesses, including Agent Treacy and some of

19    the BOP staff.  And my concern, I'm not sure what the

20    relevance -- I don't know what they will testify to for him,

21    and I don't know what the relevance is.

22         I want to make sure he's not calling them just to

23    impeach them with improper hearsay or something like that, and

24    I did put that in my trial memo.  I don't know how to

25    determine that unless I get some sort of offer of proof from

1    the defense, and so that is what I would be seeking.

2              THE COURT:  That would be a really great trick if

3    you could do it.  But unless he's willing to tell you, I'm not

4    going to make him.

5              MS. SANNEMAN:  Thank you, your Honor.

6              THE COURT:  You're welcome.

7              MS. SANNEMAN:  Does the Court agree, however, that

8    the defendant --

9              THE COURT:  The Court agrees that Mr. Goldman should

10   not call people for improper purposes, and at the moment, I

11   have no reason to think that he plans to do that.

12             MR. GOLDMAN:  I wouldn't.

13             MS. SANNEMAN:  Thank you.

14             THE COURT:  The outstanding jury instruction -- did

15   that have to do with the use of force?

16             MS. SANNEMAN:  It did.  And I have -- so --

17             THE COURT:  Is it the one that says there's a use of

18   force when one person intentionally strikes --

19             MS. SANNEMAN:  Yes.

20             THE COURT:  Okay.

21             MS. SANNEMAN:  Here's my concern.  Defense counsel

22   indicated he wanted to go back and use the one that we used at

23   the last trial, which is there is a use of force when one

24   person intentionally strikes, wounds, or uses physical force

25   on another or when one person intentionally makes a display of

1   force which reasonably causes a person to fear immediate

2   bodily harm.

3          Now, I am concerned for a couple of reasons.  The

4   first reason is that second part there, I think that's common

5   law assault.  I think that goes to the misdemeanor charge of

6   111.  So I'm afraid that we might be confusing things, and I

7   would just prefer to take that out.  When one person

8   intentionally makes a display of force which reasonably causes

9   a person to fear immediate bodily harm.

10          MR. GOLDMAN:  I'll agree with that.  Struck, your

11   Honor.

12          MS. SANNEMAN:  Unless the Court thinks I'm

13   misinterpreting it.

14          THE COURT:  So.  I --

15          MS. SANNEMAN:  And I have a copy.

16          THE COURT:  Okay.

17          MS. SANNEMAN:  It's not in your -- because it was

18   the use of force instruction that was used at the last trial.

19          MR. GOLDMAN:  Could you say which instruction number

20   it is?

21          MS. SANNEMAN:  It was 14 from the last trial.

22          THE COURT:  So you're suggesting that the

23   instruction be there is a use of force when one person

24   intentionally strikes, wounds, or uses physical force on

25   another?

1          MS. SANNEMAN:  Well, I think as it's charged here,

2     that last part wouldn't be appropriate.  So my first problem

3     with it is that last part.

4          THE COURT:  Oh, first of all, you need to slow down.

5     Second, when I ask a question, you need to focus on my

6     question and just answer the question that I'm asking because

7     that's what I have in my mind.  And if you go off on something

8     else, I get confused.

9          MS. SANNEMAN:  I will.

10         THE COURT:  So my question was the statement I just

11    read, is that the instruction that you want?

12         MS. SANNEMAN:  No.

13         THE COURT:  Okay.  What instruction do you want?

14         MS. SANNEMAN:  Well, I think the more appropriate

15    instruction would be the one that I proposed.  I don't

16    necessarily have an objection to the statement that you just

17    read except that I'm a little confused about the current state

18    of the law and about the fact that it seems like the

19    Ninth Circuit is now requiring that some form of assault be --

20         THE COURT:  No, no.  We're beyond the last portion.

21    We're only talking about the first portion of 14 versus the

22    present proposed 25.

23         MS. SANNEMAN:  Yes.

24         THE COURT:  Those are the two.

25         MS. SANNEMAN:  Yes.  And even in the first portion

1    of 14, I think it probably is fine.  I just wanted to make

2    sure that the defense, after the new case, I think it's called

3    Chapman, that we're all in agreement that the otherwise uses

4    physical force is sufficient.

5         MR. GOLDMAN:  Your Honor, I'm not familiar with the

6    Chapman case, and before I comment, I would like to review

7    that case.  My initial instinct is to say with respect to the

8    proposed Jury Instruction 14, that consistent with the

9    government's theory, it should be there is a use of force when

10   one person intentionally strikes, wounds, or uses physical

11   force on another.

12        Because the government's theory of the case is that

13   Mr. Osazuwa attacks Mr. Medina, punches him, and knocks him

14   down.  Not that he touches him or that he pats him or that he

15   impedes him, but that he actually physically punches him and

16   knocks him down.

17        THE COURT:  I guess I'm not sure what the

18   government's now proposing is not better for Mr. Osazuwa.

19        MR. GOLDMAN:  In terms of the complete instruction,

20   your Honor?  Proposed 14?

21        THE COURT:  No.  Now I'm confused.  I think the

22   government wants 25, which says there's a use of force when

23   one person intentionally strikes, punches, hits, pushes, or

24   bumps another, which seems a whole lot more specific than uses

25   physical force on another.

1          MR. GOLDMAN:  You know what?  I must have a

2    different -- okay.  Let me go back.

3          MS. SANNEMAN:  I might be able to clarify.  The

4    reason I created that jury instruction was at defense

5    counsel's request, which was that the other one wasn't

6    specific enough.

7          MR. GOLDMAN:  Your Honor, I apologize.  I was

8    looking at the 2007 instructions.  So 25 is there's a use of

9    force when one person intentionally strikes, punches, hits,

10   pushes, or bumps another.

11         MS. SANNEMAN:  And the government's position is even

12   after Chapman, the other jury instruction would probably be

13   fine, but I did want a general consensus on that before going

14   forward.

15         MR. GOLDMAN:  Your Honor, I agree with 25.

16         THE COURT:  Okay.  25 is okay with you?

17         MR. GOLDMAN:  It is.

18         THE COURT:  Great.  Have you talked about the prior

19   conviction and what is going to be admissible on that?

20         MS. SANNEMAN:  We have.  It's my understanding that

21   if the defendant takes the stand, either defense counsel on

22   direct or I on cross can go into the fact that defendant was

23   convicted, that he served a day, that he had to pay

24   restitution in the amount, that he got three months in

25   community confinement, and --

1          MR. GOLDMAN:  Five years of supervised release and a

2     hundred dollar special assessment.

3          THE COURT:  Okay.  Anything else we need to talk

4     about?

5          MR. GOLDMAN:  I don't think so, your Honor.  Your

6     Honor, as the trial unfolds, I may have additional

7     instructions to submit consistent with what evidence comes

8     out.  But other than that, I think we're in accord.

9          (Recess taken.)

10          **(WHEREUPON THE PROSPECTIVE JURY PANEL ENTERS.)**

11                         **JURY VOIR DIRE**

12          THE COURT:  Good morning, ladies and gentlemen.  Now

13     that you've all found a seat, I'm going to ask you to stand

14     again and please raise your right hand.

15          Ms. Plato, would you please swear in our prospective

16     jurors.

17               (Prospective panel sworn.)

18          THE COURT:  Thank you, have a seat.

19          Ladies and gentlemen, welcome to courtroom 8840 of

20     the United States District Court.  We all want to thank you in

21     advance for the time and attention that you are going to be

22     giving to this case.  We're here to select a jury to try a

23     criminal case referred to as United States versus Osazuwa.

24          The first thing I want to do is introduce our court

25     staff.  I'm Judge Fischer.  Our courtroom deputy clerk is

1   Ms. Debra Plato, and our court reporter is Mr. Mark

2   Schweitzer.  You'll be given the phone number to call in case

3   an emergency arises and you need to contact us.  Please make

4   every effort to be on time.

5          Now that you've been sworn in as our panel of

6   prospective jurors, we cannot get started until everyone is

7   here.  As much power as I seem to have sitting way up here, I

8   can't do anything unless you're all here.

9          So if something beyond your control happens, please

10  call and let us know when you will be able to get here.  Give

11  us a phone number, if you can.  Don't just assume that if you

12  cannot get here quickly, you will no longer be on our jury.

13  Depending on where we are in the trial, we may decide to wait

14  for you, even if you cannot get here the same day.

15         So it's important that we know what your issue is

16  and how we can reach you.

17         Is anyone having any trouble hearing me?  I don't

18  see any hands.  That's great.  If do you have trouble hearing

19  me or anyone else during the course of the trial, please let

20  me know right away, and we'll do something about it.  It's

21  important that you hear everything that happens in the

22  courtroom unless, of course, the attorneys and I are having

23  one of those sidebar things that you may have seen on TV or if

24  you've been on trials before.

25         That means we'll be over here having a discussion

1   with our court reporter, and you can stand up.  You can move

2   around a little bit.  Do not leave the courtroom, and please

3   keep your voices down because Mr. Schweitzer is trying to hear

4   everything that we're saying and take it down.

5          This is going to be a very short trial.  So you've

6   lucked out in that regard.  Probably just take a couple of

7   days.  But I'm going to ask in a few minutes whether

8   serving -- well, I guess I'm really not going to ask because I

9   understand we're screening you now, and you've had the

10  opportunity to tell the clerks over there or the magistrate

11  judges that you wanted to defer your service or be excused

12  from your service.

13         So unless something incredible happened on the way

14  over here from the Spring Street courthouse, you should all be

15  available to serve.

16         Let me tell you, though, that we'll generally be in

17  session from 8:00 A.M. until 2:00 P.M.  If you work in the

18  afternoon, you can go pack to work; however, you will have

19  served a full day of jury service here so that if someone is

20  checking on you, we will confirm that you have served a full

21  day of jury service.  So what you do after that is up to you.

22         We expect that the trial will be done by the end of

23  the week.  Sometimes things happen that we don't expect.  We

24  might need you to come back a day or two next week for

25  deliberations, but because we can never really promise how

19

```
 1   long things are going to happen, we are going to go a little
 2   longer today.  We'll take a lunch break and probably break
 3   this morning and break this afternoon since we didn't get
 4   started until much later.
 5        But let me just ask if anybody, based on that
 6   schedule or something that happened on the way over here
 7   across the street, prevents you from serving.
 8        Ma'am, state your name, please, and tell me what
 9   your problem is.
10        PROSPECTIVE JUROR SCHEEL:  Mariana Scheel.  I'm a
11   full-time student, and I go to school Monday through Thursday.
12        THE COURT:  Okay.  What are you doing here, then?
13        PROSPECTIVE JUROR SCHEEL:  I called in, and they
14   said I had to come in the morning.  I didn't have no
15   questionnaire asking for a postponement or an excuse or
16   anything.
17        THE COURT:  When do you have a school break?
18        PROSPECTIVE JUROR SCHEEL:  The semester doesn't end
19   until, I believe, December 19th is the last day.
20        THE COURT:  Okay.  I'm going to defer your service.
21   You don't get out of jury duty just because you're a student.
22   We need people from every area of the community.  But I'll
23   defer it until the Tuesday after December 19th.  So go back to
24   the jury room and tell them your service has been deferred.
25        Thank you.
```

1            Anybody else?

2            Okay.  Let me ask counsel to introduce themselves

3    and the people at their tables.

4            First from the government.

5            MS. SANNEMAN:  Good morning.  My name is Angela

6    Sanneman.  I'm the prosecutor on this case.  And here with me

7    at counsel table is FBI Special Agent Brian Treacy.

8            THE COURT:  Mr. Goldman.

9            MR. GOLDMAN:  Good morning, ladies and gentlemen.

10   My name is Richard Goldman, and this is my client, Daniel

11   Osazuwa.

12           Mr. Osazuwa, would you introduce yourself.

13           THE DEFENDANT:  Good morning, ladies and gentlemen.

14   My name is Daniel Osazuwa.

15           THE COURT:  Thank you.  Does anyone recognize any of

16   the attorneys or the court staff that I mentioned earlier?

17   Okay.  I don't see any hands.

18           In the future, if I don't see any hands, I'm just

19   going to go on to the next topic or my next question.  If you

20   had a hand up and I didn't notice it, then flail your arms and

21   get my attention because I do need to have the answers to all

22   of my questions.

23           You may hear the names of the following other

24   people, or they may be called as witnesses.

25           Oscar Medina.

 1              Virginia Castillo.

 2              Arthur Avila.

 3              Danny Parker.

 4              Alfred Sigala.

 5              David Cloney.

 6              Vincent Legaspi.

 7              So any of those names sound familiar to anyone?

 8              I don't see any hands.

 9              You'll also hear evidence about the Metropolitan

10   Detention Center, which is sometimes referred to as MDC.  If I

11   had any sense of direction at all, I would point to it, but I

12   have no idea.  Is it that way?  Thank you.  The building on

13   the corner there.  Other than having seen it or driven by it,

14   anybody know anything about that building?

15              All right.  Great.

16              This is a criminal case brought by the United States

17   government.  The government charges that on or about April 14,

18   2007, in Los Angeles County, within the Central District of

19   California, defendant, Daniel Osazuwa, Jr., forcibly assaulted

20   and interfered with Federal Bureau of Prisons Senior

21   Correctional Officer Oscar Medina while Officer Medina engaged

22   in his official duties.

23              The government also charges that the defendant's

24   actions inflicted bodily injury to Officer Medina.

25              The charges against the defendant are contained in a

1    document that we call an indictment.  An indictment is simply

2    a description of the charges made by the government against

3    the defendant.  It is not evidence of anything.  The defendant

4    has pleaded not guilty to the charges and is presumed innocent

5    unless and until proved guilty beyond a reasonable doubt.

6            A defendant has the right to remain silent and never

7    has to prove innocence or present any evidence.

8            Is there anyone who feels that he or she cannot give

9    the defendant a fair trial just after hearing that brief

10   summary that I gave you?

11           All right.  Thank you.  And I mentioned that the

12   defendant is presumed innocent.  The presumption of innocence

13   places on the government the burden of proving the defendant

14   guilty beyond a reasonable doubt.  Proof beyond a reasonable

15   doubt is proof that leaves you firmly convinced that the

16   defendant is guilty.  It is not required that the government

17   prove guilt beyond all possible doubt.

18           A reasonable doubt is a doubt based on reason and

19   common sense and is not based purely on speculation.  It may

20   arise from a careful and impartial consideration of all the

21   evidence or from lack of evidence.  If, after a careful and

22   impartial consideration of all of the evidence, you are not

23   convinced beyond a reasonable doubt that the defendant is

24   guilty, it is your duty to find the defendant not guilty.

25           On the other hand, if, after a careful and impartial

1   consideration of all the evidence, you are convinced beyond a

2   reasonable doubt that the defendant is guilty, it is your duty

3   to find the defendant guilty.

4          Is there any reason that any one of you cannot

5   follow the law and the instructions that I give to you,

6   including my instructions on the presumption of innocence and

7   the burden of proof?

8          Great.  I don't see any hands.

9          It's the duty of the jurors to find the facts from

10  all the evidence in the case.  To those facts you will apply

11  the law as I give it to you.  You must not be influenced by

12  any personal likes or dislikes, opinions, prejudices, or

13  sympathy.  And you may not consider the punishment for this

14  crime in determining whether the government has proved the

15  case beyond a reasonable doubt.

16         Is there anyone here who cannot follow these

17  instructions?

18         Great.  We're now going to begin selecting the jury.

19  The purpose of the jury is to find and determine the facts.

20  Under our system of justice, you are the sole judges of the

21  facts.  And therefore, it's extremely important that you

22  perform your duty diligently and conscientiously.

23         In the trial of this and every other criminal case,

24  each side is entitled to have a fair unbiased and unprejudiced

25  jury.  The goal of jury selection is to choose 12 jurors and

1    an appropriate number of alternates who can be fair and

2    impartial jurors to both sides in the case and who will be

3    able to decide the questions presented to them based solely on

4    the evidence presented during the course of the trial.

5            Now, as we go through the process of jury selection,

6    if there's any fact or reason why any of you might be biased

7    or prejudiced in any way, you must disclose the facts or

8    reasons when you are asked to do so.  And it is your duty to

9    make that disclosure.

10           During jury selection, the Court and counsel will

11   ask you about your background and experience to help us

12   determine whether you are qualified to be a juror in this

13   case.

14           And qualified just means that you can be fair and

15   impartial and that you can decide the case based on the

16   evidence that you hear in the courtroom and on nothing else.

17           There's no such thing as a right or a wrong answer.

18   Answers are only complete or incomplete.  So please err on the

19   side of giving us too much information rather than too little,

20   and if you don't fully understand a question, please ask me to

21   explain.  And, of course, you've sworn to tell the truth.

22           I'm going to ask the first group of jurors, who will

23   be called momentarily by Ms. Plato, to give us the information

24   that's listed on the piece of paper on the chairs in the jury

25   box, and that's your name, your general area of residence, the

1   highest level of education or any specialized training that

2   you have, your employer and your occupation, your marital

3   status, whether you're married or divorced or single or

4   widowed, the occupation of any adults living with you and

5   any -- and that includes adult children, even if they don't

6   live with you.

7        I'm going to ask whether you served on a jury

8   before, and if so, whether it was a civil jury or a criminal

9   jury.  And I'll ask what kind of claim it was or what kind of

10   charge.  And I'll ask whether the jury reached a verdict.  I

11   don't want to know what the verdict was.  I just want to know

12   whether you reached one, and I'll also ask whether you have

13   any Grand Jury experience.

14        If you've ever served on a civil jury, you must

15   understand that there are substantial differences in the rules

16   that apply to the trial of a criminal case from those that

17   apply to civil trials.  And that's particularly true with

18   regard to the burden of proof.

19        In a civil case the burden of proof is usually a

20   preponderance of the evidence.  In a criminal case, as I told

21   you, and I'll tell you several times more during the course of

22   the proceeding, the defendant is presumed to be innocent, and

23   before he may be found guilty, the government must prove guilt

24   beyond a reasonable doubt.

25        After you answer those initial questions, I'll

1   review the questionnaire that I think you've been given, and I

2   might also have a few additional questions.  I'll allow the

3   attorneys just a couple of minutes to ask you questions if

4   they would like to do that.

5          And I know it can be rather boring to be sitting out

6   there while we're focusing on the first group of jurors that

7   we're going to call because I have sat out there once or twice

8   myself during jury service.  But please pay attention to the

9   questions that are being asked and the answers that are being

10  given and make a mental note if your answers would be

11  different.  That will speed things along if the first jurors

12  questioned are excused and you're recalled to replace them.

13  And that will save us some time.

14         Please understand that in asking the questions,

15  we're only trying to select a fair, impartial, and unbiased

16  jury.  We're not trying to pry, but it is very important that

17  you be honest in your answers, and you have taken an oath to

18  answer truthfully and fully.

19         Sometimes the questions call for rather personal

20  information, and so if you feel that the answer may be

21  embarrassing, you may ask to answer privately, and we'll hear

22  your answer at sidebar.  And that's really only semi-private

23  because the counsel are entitled to hear your answer, and the

24  court reporter is required to be there and record it.

25         We don't want to embarrass anyone, but we do need to

1    have our questions answered.  But please don't ask for a

2    sidebar to tell us that your brother-in-law's uncle's friend

3    had a DUI in New York 10 years ago.  Believe me, the lawyers

4    and I have heard it all, and you're never going to see these

5    people again.

6              So it will really save us a lot of time if you can

7    answer from your seat.  But, of course, if you really need to

8    have a sidebar to answer truthfully and fully, then just ask

9    us about that.

10             As we ask the questions, Mr. Schweitzer is taking

11   down every word that's said in the courtroom.  He's terrific,

12   but to assist him in getting an accurate transcript, you need

13   to answer out loud.  Don't just nod or shake your head or

14   shrug your shoulders.  Please try to say "yes" or "no" rather

15   than "uh-huh" or "huh-uh" because it's very difficult for us

16   to tell what you mean, and as terrific as he is,

17   Mr. Schweitzer can only take one person at a time.  And that's

18   usually me.

19             So please be patient and let me finish my question,

20   and we'll try to be patient until you finish your answers.

21             Ms. Plato, are you ready to call our prospective

22   jurors?

23             THE CLERK:  I am, your Honor.  Thank you.

24             THE COURT:  We're going to seat you first in the

25   back row, that far corner.  We're going to seat you 1 through

```
 1   6.  There's going to be a couple of extra seats, but don't

 2   worry about those.  And seat No. 7 is going to be in the

 3   second row, and we'll go through 12, and then we'll seat 13

 4   through 18 in the first row.

 5             THE CLERK:  Ted Hibner, Juror No. 1.

 6             THE COURT:  Step forward, sir, and take seat No. 1.

 7             THE CLERK:  Milton Medina, Juror No. 2.

 8             Michael Spence, Juror No. 3.

 9             Joyce Thomas, Juror No. 4.

10             Tony Massihi, Juror No. 5.

11             And Amy Plaster, Juror No. 6.

12             Juror No. 7, Maryann Wesson.

13             Juror No. 8, Michael Savoy.

14             Juror Savoy, Denise Payton.

15             Juror No. 10, Marcela Ortega.

16             Juror No. 11, Maria Trimble.

17             Juror No. 12, Judith Collinge.

18             Juror No. 13, Maria Sanchez.

19             Juror No. 14, David Clift.

20             Number 15, Claudia Stepan.

21             Number 16, Krystal Flowers Johnson.

22             Number 17, Wendy Lau.

23             And No. 18, Diana Dillon.

24             THE COURT:  All right.  I'm going to refer to you

25   all by the seat numbers that Ms. Plato used when she called
```

1    you, and that will make it a lot easier for our court

2    reporter.  And I'll ask counsel to do the same.  And you have

3    a microphone, Juror No. 1.  And that single page, not the

4    longer page with lots of questions, but just that single page

5    starting -- why don't you just go to your area of residence

6    and tell us what that is.

7                 PROSPECTIVE JUROR HIBNER:  West Covina.

8                 THE COURT:  Thanks.  Just go right down that list

9    and give us that information, sir.

10                PROSPECTIVE JUROR HIBNER:  18 plus, retired from

11   psychology, teaching, counseling, and social work.  Married.

12   Wife retired.  No adult children.  One criminal case.  I was a

13   juror.  Reached a verdict.  No Grand Jury.

14                THE COURT:  Thank you, what did your wife do before

15   she retired?

16                PROSPECTIVE JUROR HIBNER:  A rehabilitation

17   counselor with the State of California.

18                THE COURT:  Thank you.

19                Juror No. 2.

20                PROSPECTIVE JUROR MEDINA:  Hawthorne, California.

21   Los Angeles Trade Tech College, program specialist.

22                Married.  No children.

23                Served in a civil court, reached a verdict.  No

24   Grand Jury experience.

25                THE COURT:  Thank you.  You said L.A. Trade Tech and

1    what program?

2              PROSPECTIVE JUROR MEDINA:  Program specialist.

3              THE COURT:  What is that?

4              PROSPECTIVE JUROR MEDINA:  It's different areas, but

5    most of my job duties is web development.

6              THE COURT:  Web development?

7              PROSPECTIVE JUROR MEDINA:  Yes.

8              THE COURT:  And does your wife work outside the

9    home?

10             PROSPECTIVE JUROR MEDINA:  No.

11             THE COURT:  Do you remember what the claim was in

12   that civil case?

13             PROSPECTIVE JUROR MEDINA:  DUI.

14             THE COURT:  Okay.  Unless it was about an accident,

15   that's probably a criminal case.  For anyone who is wondering,

16   driving under the influence is a crime.

17             Juror No. 1, I forgot to ask you, what was the

18   charge in your criminal case?

19             PROSPECTIVE JUROR HIBNER:  Substance abuse.

20             THE COURT:  Thank you.  Pass that down to Juror

21   No. 3, please.

22             PROSPECTIVE JUROR SPENCE:  West Los Angeles, four

23   years of college.  I'm a self-employed free-lance film editor,

24   married, and my wife is an administrator for an entertainment

25   law firm.  No children.  I was in one civil case.  It was an

1    automobile accident.  And there was a verdict, and I've never

2    served on the Grand Jury.

3            THE COURT:  Thank you.  You say your wife is an

4    administrator.  Does she do any legal work at all in research

5    or that kind of thing?

6            PROSPECTIVE JUROR SPENCE:  No.

7            THE COURT:  Okay.  And do you know whether the

8    entertainment lawyers in that firm go into court, or do they

9    mostly do contracts?

10           PROSPECTIVE JUROR SPENCE:  I think it's mostly

11   contractual.

12           THE COURT:  Okay.  Great.  Thank you.

13           Juror No. 4.

14           PROSPECTIVE JUROR THOMAS:  Long Beach.  Two Bachelor

15   of Science degrees.  I work for the Internet Corporation of

16   assigned names and numbers.  I'm a technical project manager.

17   I manage software development projects.  I am -- well, I have

18   an ex-domestic partner.  So I don't think you have a category

19   for me, but can that count as divorced?  No adult children,

20   and I have not served any prior jury service on any court.

21           THE COURT:  What did your ex-partner do?

22           PROSPECTIVE JUROR THOMAS:  She's a technical project

23   manager as well.

24           THE COURT:  I've seen those initials so many times,

25   that now I know it's real.  Is it pronounced "IK"?

1          PROSPECTIVE JUROR THOMAS:  Yes.

2          THE COURT:  Juror No. 5.

3          PROSPECTIVE JUROR MASSIHI:  I'm from Burbank.  I

4   have a Bachelor of Science in information technology.  My

5   current employer is Platinum Group of Companies.  I do

6   technical support there.  And I'm single.  My father does

7   computer science.  And I've never served on a jury.

8          THE COURT:  Thank you.  Juror No. 6.

9          PROSPECTIVE JUROR PLASTER:  I'm from Westlake

10  Village.  I have a Bachelor's of Science.  My employer is Law

11  Offices of Masry and Visitoe, and I'm a legal assistant there.

12  I'm single.  I share a home with a real estate agent and have

13  no prior jury service.

14          THE COURT:  Tell me a little bit about the work that

15  you do with Masry and Visitoe.

16          PROSPECTIVE JUROR PLASTER:  Primarily assisting with

17  sending out legal services agreements on toxic tort cases and

18  some pharmaceutical cases.

19          THE COURT:  Does that firm do any criminal work at

20  all?

21          PROSPECTIVE JUROR PLASTER:  No.

22          THE COURT:  Have you ever done any work with lawyers

23  who did criminal work?

24          PROSPECTIVE JUROR PLASTER:  No.

25          THE COURT:  You know if you're on our jury that you

1   can't go back to the office and research whether I'm doing

2   this right?

3           PROSPECTIVE JUROR PLASTER:  That's right.

4           THE COURT:  Okay.  Thank you.  Pass that microphone

5   down to Juror No. 7, please.

6           PROSPECTIVE JUROR WESSON:  I live in Covina.  I've a

7   Bachelor of Arts degree.  I'm retired.  Previous employment is

8   a sales manager in a distributor of metal working tools.  I'm

9   married.  My husband is retired, engineer with the Southern

10  California Gas Company.  I have two adult children.  One is a

11  chiropractor, who mostly does computer work, and a daughter

12  who is in college.  I've had -- several times I've had jury

13  duty.  Once civil, and exactly what the charges or the claim

14  was, it was misconduct against a police officer in the City of

15  Long Beach.

16          And criminal, several DUI and minor charges

17  regarding -- I can't even -- it's been so long since I've done

18  it, but they were not assault, but they were similar kinds of

19  things.  We always reached a verdict, and I've had no Grand

20  Jury experience.

21          THE COURT:  Thank you.  Juror No. 8.

22          PROSPECTIVE JUROR SAVOY:  Encino, California.  I

23  have a Bachelor's, a B.A., and I'm also a CPA.  My employer is

24  Biner and Savett (phonetic) in Santa Monica.  I am a managing

25  partner of a CPA firm in Santa Monica.  I am married.  My wife

1    is a preschool teacher.  I have no adult children.  I have no

2    prior jury service.  And I have no Grand Jury.

3              THE COURT:  All right.  Thank you.  Juror No. 9.

4              PROSPECTIVE JUROR PAYTON:  I live in Sun Valley,

5    California.  And I have a high school education plus some

6    college classes.  I work at Frys Electronics.  I am a sales

7    associate.  I'm divorced.  I have two children.  One is

8    unemployed and going to school part time.  Another works at a

9    business card printing place.  And I have never served on a

10   jury and no Grand Jury experience.

11             THE COURT:  Okay.  Tell us about your husband when

12   you were together.

13             PROSPECTIVE JUROR PAYTON:  He was a professional

14   student.

15             THE COURT:  Some people thought I was doing that for

16   a while, too.

17             All right.  Juror No. 10.

18             PROSPECTIVE JUROR ORTEGA:  Hi.  City of Baldwin

19   Park.  I have an Associate in Science.  Employer, the Paul

20   Corporation.  And a lead operator, production.  Single.  My

21   mother works in a manufacturing place where they make CD's for

22   computers.  Never been on a jury.  Never served Grand Jury

23   also.

24             THE COURT:  Tell me a little bit more about your

25   job.  You said you're a lead operator in production?

```
 1              PROSPECTIVE JUROR ORTEGA:  Yes.

 2              THE COURT:  What do you do?

 3              PROSPECTIVE JUROR ORTEGA:  It's a manufacturing

 4    place.  We do blood banks for American Red Cross.

 5              THE COURT:  Okay.  Thank you.

 6              Juror No. 11.

 7              PROSPECTIVE JUROR TRIMBLE:  I live in the City of

 8    Moorpark.  I have a high school equivalent education.  I am a

 9    homemaker.  I am married.  My husband works for electronic.

10    He's the vice-president for quality control.  I have two

11    children attending school, and I have no prior jury service.

12              THE COURT:  Thank you.  Juror No. 12.

13              PROSPECTIVE JUROR COLLINGE:  I live in Ventura.  I

14    have a Master's.  I work for the Ventura County Public Health,

15    supervising accountant.  Single.  No adults, no adult

16    children.  I mean no adults living with me and no adult

17    children.  I have never been on a civil case.  A criminal

18    case, I think it was aiding and abetting.  And we did reach a

19    verdict.  I was also an alternate on an attempted murder.  I

20    was not part of the jury, but they did reach a verdict.  And I

21    have no Grand Jury experience.

22              THE COURT:  Great.  Thank you.

23              I think we have another microphone out there for

24    Juror No. 13.

25              PROSPECTIVE JUROR SANCHEZ:  Los Angeles.  15 years
```

1    of education.  I work for Wells Fargo Bank.  Branch manager.

2    I am married.  My husband is a supervisor of a materials

3    store.  I have young adults living at home.  They are both

4    counselors at residential homes for problem teenagers.  And I

5    have no prior jury services.

6              THE COURT:  Thank you.

7              Juror No. 14.

8              PROSPECTIVE JUROR CLIFT:  I live in Valencia.  I

9    have an A.A. in science.  I work for Volchem Materials

10   Company.  I am a sales rep, married.  My wife stays at home.

11   We have two children.  Criminal, yes.  It was a murder case.

12   We did reach a verdict.  No Grand Jury experience.

13             THE COURT:  Thank you.  Juror No. 15.

14             PROSPECTIVE JUROR STEPAN:  I live in Northridge.  I

15   have some college.  I am also a college student.  I do work

16   for Cal State Northridge.  I'm a financial aid representative.

17   I'm married.  My husband works for L.A.P.D.  I have two

18   children.  They are grown.  My son, also L.A.P.D.  My daughter

19   is a probation officer in Ventura County.  I've been on a

20   civil case before, and it was a car accident.  And no other

21   jury experience.

22             THE COURT:  Was there a verdict in that case?

23             PROSPECTIVE JUROR STEPAN:  Yes, there was.

24             THE COURT:  Okay.  And you say your husband and son

25   work for L.A.P.D.  Are they sworn officers?

1          PROSPECTIVE JUROR STEPAN:  Yes, ma'am.

2          THE COURT:  Okay.  Thank you.  And the probation

3    officer works for Ventura County.  And do you know where --

4    did you say that was your daughter?

5          PROSPECTIVE JUROR STEPAN:  My daughter.

6          THE COURT:  Do you know about what she does?  Does

7    she work with juveniles?

8          PROSPECTIVE JUROR STEPAN:  Juveniles.

9          THE COURT:  Okay.  Juror No. 16.

10         PROSPECTIVE JUROR FLOWERS:  My residence is

11   Palmdale, California.  I have a Bachelor of Arts degree.  I

12   work for Jacobs Technology.  I'm a project coordinator.  I'm

13   married.  My husband is a barber.  I've served on a criminal

14   trial.  It was domestic violence.  There was a verdict

15   reached, and I've never had any Grand Jury experience.

16         THE COURT:  All right.  Thank you.

17         Juror No. 17.

18         PROSPECTIVE JUROR LAU:  Good morning, your Honor.  I

19   live in La Verne, California.  I have a juris doctorate.  My

20   employer is Wood, Smith, Henning, and Berman, LLP.  I am an

21   attorney.  I'm single.  My roommate works in public relations.

22   I've had no prior jury experience or experience with Grand

23   Jury.

24         THE COURT:  What kind of work do you do as a lawyer?

25         PROSPECTIVE JUROR LAU:  Civil defense litigation.

```
 1              THE COURT:  Does the firm do any criminal work?

 2              PROSPECTIVE JUROR LAU:  No.

 3              THE COURT:  Have you ever done any criminal work?

 4              PROSPECTIVE JUROR LAU:  No.

 5              THE COURT:  And you understand that you can't do any

 6    research about the case either?

 7              PROSPECTIVE JUROR LAU:  I have no desire to.

 8              THE COURT:  Okay.  Juror No. 18.

 9              PROSPECTIVE JUROR DILLON:  I live in El Segundo.  I

10    have an Associate of Arts degree.  I work for a company called

11    Great Guns USA.  It's a television commercial production

12    company.  I'm an office manager.  I'm single.  I live with my

13    boyfriend, who is an electrician in the entertainment

14    industry.  I have never served on a jury or a Grand Jury.

15              THE COURT:  All right.  Thank you.  Let's turn now

16    to that longer list of questions, and I'm going to be asking

17    you these questions as a group.  And I'll ask you to raise

18    your hands if you have any yes answers, and then we'll inquire

19    further.

20              First, I need to tell you that it's the duty of the

21    Court to instruct the jury on the law that applies to this

22    case.  And it's the duty of the jurors to follow those

23    instructions whether or not you agree with them and whether

24    you approve or disapprove of them.  You may not substitute

25    your own idea of what you think the law should be.
```

1           Is there anyone who would have any difficulty in

2    following my instructions and applying the law to this case,

3    whether you approve or disapprove of the law as I have stated

4    it to you or will state it to you later?  Our instructions?  I

5    see no hands.

6           Would anyone have any difficulty keeping an open

7    mind until you have heard all of the evidence and arguments of

8    the counsel and until the Court's given you all the

9    instructions?

10          No hands.

11          Has anyone heard anything about this case, by any

12   chance, other than what the Court's just said?

13          Would anyone have any difficulty evaluating the

14   testimony of all of the witnesses in the same way regardless

15   of who they are?

16          Would the fact that a party, an attorney, or a

17   witness might come from a particular national, racial, or

18   religious group or might have a life-style different from

19   yours affect your judgment or the weight or credibility you

20   would give to that witness's testimony?

21          No hands.  Mr. Osazuwa was born in Nigeria.  Is

22   there anything about the fact that Mr. Osazuwa was born in a

23   different country that would have any impact on your ability

24   to be fair and impartial?  Anyone have any feelings along

25   those lines?

1      Have you, a relative, or a close friend had any

2  experiences with people from Nigeria, positive or negative?

3      PROSPECTIVE JUROR THOMAS:  I have two close friends

4  I have known for 20 years, a married couple.  They were both

5  born in Nigeria, and I've met their families, and my

6  experience has always been positive.

7      THE COURT:  Great.  Anybody else have any positive

8  or negative experiences?

9      Great.  Thank you.

10      Does anyone have any difficulty accepting the

11  principle that the defendant is presumed innocent until proven

12  guilty beyond a reasonable doubt?  Anyone think we should have

13  a different standard than that in our criminal cases in this

14  country?

15      Great.  Grand Jury proceedings are very different

16  from trials.  Just as an example, the government does not have

17  to prove guilt beyond a reasonable doubt, and the defendant

18  does not have an opportunity to be present or to cross-examine

19  witnesses or other things along those lines that we have in

20  jury trials.  Does anyone believe that the fact that an

21  indictment has been returned against the defendant is evidence

22  that the defendant is guilty?

23      Great.  Is there anyone who would vote to find a

24  defendant guilty even if you believe the government has not

25  proven every element of the charges beyond a reasonable doubt?

1          Great.  Does anybody believe it's unfair to require

2     the government to meet that burden?  Good.

3          Have you or any relatives or close friends had law

4     enforcement training or experience, had any involvement in law

5     enforcement, worked as a prison guard, had any other job in a

6     prison, jail, or correctional facility, worked as lawyers or

7     worked with the court system in some way?  That's a very broad

8     question.  It includes any police department, Sheriff's

9     Office, highway patrol, District Attorney's Office, City

10    Attorney's Office, Attorney General's office, U.S. Attorney,

11    FBI, BATFE, that's the new ATF, IRS, ICE, local, state, or

12    federal corrections departments, probation department,

13    et cetera?  Very broad category.

14         We've heard from a couple of people already.

15    Lawyers and people with relatives who are probation officers

16    and law enforcement.  You don't need to repeat it if you've

17    already told me.  So we'll go row by row so you're not hanging

18    your hands in the air.

19         Back row there, Juror No. 1, tell us about that.

20         PROSPECTIVE JUROR HIBNER:  I worked for the County

21    of Orange Juvenile Court, and I've done investigations with

22    police.  I know a lot a judges, lawyers, and county counsel

23    and court officers, and I've testified a lot in court,

24    probably over 500 cases.

25         THE COURT:  And when you testified in court, was

1    that generally for one side or the other?

2              PROSPECTIVE JUROR HIBNER:  It was for the county and

3    the social service agency.

4              THE COURT:  Okay.  Tell me a little bit about the

5    kinds of participation that you had in the investigations.

6              PROSPECTIVE JUROR HIBNER:  Investigation, any type

7    of child abuse, a wide variety.  You'd be called out on a

8    case, and you'd go out and investigate and then make your

9    recommendations to court or deal with the police at the same

10   time.

11             THE COURT:  Would you talk to the children and other

12   witnesses?

13             PROSPECTIVE JUROR HIBNER:  Oh, yes, extensively.

14             THE COURT:  Did you document the interviews or the

15   results in writing?

16             PROSPECTIVE JUROR HIBNER:  Yes.  And I wrote the

17   court reports and was the main person testifying in the court

18   hearings.

19             THE COURT:  Okay.  How did you document those?  Were

20   you taking notes while you were interviewing people, or did

21   you wait and do that afterwards?

22             PROSPECTIVE JUROR HIBNER:  I did both.  But they

23   were extensive documentation.

24             THE COURT:  Did you do that all in handwriting and

25   then type it up later?

1           PROSPECTIVE JUROR HIBNER:  Yes, and then I'd write

2   it up and a typist would type it up for the court.

3           THE COURT:  Okay.  Thank you.

4           Other than that, any other contacts to tell us

5   about?

6           PROSPECTIVE JUROR HIBNER:  I'm not sure.

7           THE COURT:  Okay.  You mentioned lots of judges

8   and --

9           PROSPECTIVE JUROR HIBNER:  Sheriff's Department,

10  District Attorney --

11          THE COURT:  Did you have any cases where allegations

12  were made that you determined were not valid?

13          PROSPECTIVE JUROR HIBNER:  Yes.

14          THE COURT:  Okay.  And based on all of those

15  experiences, is there anything in that that makes you think

16  that you could not be fair on this case?

17          PROSPECTIVE JUROR HIBNER:  No, there is not.

18          THE COURT:  Okay.  Thank you.  Anybody else in the

19  back row?

20          Okay.  I see in the front, Juror No. 7.

21          PROSPECTIVE JUROR WESSON:  About 30 years ago I

22  worked in a volunteer program as a coordinator that involved

23  the California Youth Authority and the State Bar of

24  California.

25          THE COURT:  What kind of work did you do with them?

```
 1              PROSPECTIVE JUROR WESSON:  I was the coordinator.

 2   It was a -- kind of a big brother kind of program, and I did

 3   the matching and the counseling that went with the State Bar.

 4              THE COURT:  Okay.  So did you work with law

 5   enforcement?

 6              PROSPECTIVE JUROR WESSON:  No.  Just the -- well,

 7   Probation officers, and actually parole officers.

 8              THE COURT:  Anything about that that makes you think

 9   you couldn't be fair in this case?

10              PROSPECTIVE JUROR WESSON:  No.

11              THE COURT:  Okay.  Thank you.  And I see Juror

12   No. 9.

13              PROSPECTIVE JUROR PAYTON:  I have a cousin who works

14   for the police department.  I think now she's made detective

15   or something like that.  But that's it.

16              THE COURT:  L.A.P.D.?

17              PROSPECTIVE JUROR PAYTON:  L.A.P.D.

18              THE COURT:  Okay.  Anything about that that makes

19   you think you couldn't be fair here?

20              PROSPECTIVE JUROR PAYTON:  No.

21              THE COURT:  Great.  Anybody else in that row?  Juror

22   No. 12.

23              PROSPECTIVE JUROR COLLINGE:  My brother worked as a

24   prison guard for the State of Texas for about 10 years.

25              THE COURT:  Did he retire from that job or move on
```

1    to something else?

2           PROSPECTIVE JUROR COLLINGE:  He moved on to

3    something else.

4           THE COURT:  Okay.  Did he talk to you much about his

5    experiences?

6           PROSPECTIVE JUROR COLLINGE:  No.

7           THE COURT:  Do you know whether he ever got involved

8    in any kind of altercation with any of the inmates?

9           PROSPECTIVE JUROR COLLINGE:  No, I don't, no.

10          THE COURT:  Okay.  Is there anything about having a

11   brother who is a prison guard that makes you think you

12   couldn't be fair in this case?

13          PROSPECTIVE JUROR COLLINGE:  No.

14          THE COURT:  Okay.  Juror No. 13?

15          PROSPECTIVE JUROR SANCHEZ:  My son-in- law has

16   enforcement training.  He graduated from Rio Hondo Academy.

17   He used to work for the L.A. County Probation Department with

18   juveniles.  And he's currently in the process towards becoming

19   a police officer.

20          THE COURT:  Anything about that that makes you think

21   you couldn't be fair in this case?

22          PROSPECTIVE JUROR SANCHEZ:  No.

23          THE COURT:  Juror No. 14.

24          PROSPECTIVE JUROR CLIFT:  I have a neighbor that I

25   just saw across in the other building, L.A. County Sheriff.

1    Also my neighbor on the other side is ATF.  And then I have a

2    good friend that is Secret Service.

3              THE COURT:  Okay.  Do they talk to you much about

4    their work?

5              PROSPECTIVE JUROR CLIFT:  Not a lot.

6              THE COURT:  Anything about having those friends that

7    makes you think you couldn't be fair here?

8              PROSPECTIVE JUROR CLIFT:  No.

9              THE COURT:  All right.  Anybody else?

10             Okay.  Anyone here, have you, yourself, any

11   relatives or close friends been employed by the federal

12   government other than what we might have already heard?  Did I

13   miss somebody?  I did.  Okay.

14             Juror No. 17.  Let's get that microphone down to

15   you.

16             PROSPECTIVE JUROR LAU:  A former colleague and

17   friend is now a Special Agent.  I have friends who are in West

18   Covina Police Department, La Verne Police Department, Las

19   Vegas Metro P.D., and Ontario Police Department.

20             THE COURT:  Anything about those contacts that makes

21   you think you could not be fair in this case?

22             PROSPECTIVE JUROR LAU:  No.

23             THE COURT:  Okay.  Thank you.

24             All right.  Federal agencies?  You, somebody you

25   know, somebody close to you work for the federal government?

1            Okay.  Anyone have any opinion regarding employees

2    of the federal Bureau of Prisons or FBI agents that might

3    prevent you from measuring their testimony by the same

4    standards that you use to judge the credibility of any other

5    witnesses?

6            Has anyone had any experience with a law enforcement

7    officer where that person was not truthful?

8            I don't see any hands.

9            Would the fact that a witness is a law enforcement

10    officer make you more likely to believe that person's

11    testimony?  How about less likely?

12            Okay.  No hands for either one.

13            Would anyone have any difficulty or embarrassment

14    returning a verdict for or against the government because the

15    government has law enforcement officers as witnesses?

16            Have you, a relative, or a close friend ever been

17    accused of, charged with, or convicted of a crime?

18            Second row.  Juror No. 7.

19            PROSPECTIVE JUROR WESSON:  I have a nephew who was

20    addicted to drugs for many years and spent time in prison

21    related to that.

22            THE COURT:  Was that local?

23            PROSPECTIVE JUROR WESSON:  San Diego.

24            THE COURT:  And have you ever talked to him about

25    the court process or anything involved with that?

1          PROSPECTIVE JUROR WESSON:  Oh, I visited him there

2   and spoke about the prison experience, but that's it.

3          THE COURT:  Okay.  And did he have anything

4   particularly positive or negative to say about the prison

5   experience?

6          PROSPECTIVE JUROR WESSON:  It was just way too hot

7   there, and he didn't think it was a good idea to go back.

8          THE COURT:  Okay.  Anything about that that makes

9   you think you couldn't be fair in this case?

10          PROSPECTIVE JUROR WESSON:  No.

11          THE COURT:  Okay.  Juror No. 9?

12          PROSPECTIVE JUROR PAYTON:  Oh, my God, your Honor.

13   I'm just going to give you a brief list.  My brother has been

14   in and out of prison since he was a juvenile for domestic

15   violence and things like that.  Probably not attempted murder,

16   but he accidentally shot somebody.  Then I had an uncle who

17   went to jail for bank robbery.  But he's doing well now.

18          And then I have another uncle who just got out of

19   jail for, let's see, I guess it was statutory rape, but he was

20   like not a pimp exactly, but he had an out-call massage

21   service.  But then he, you know, employed an underage girl and

22   got in trouble for that.  The out-call massage service was

23   legit, but then he went too far.

24          So then -- oh, your Honor, I can't go on.  I mean, I

25   probably have relatives all over the world in and out of jail

 1    for something or another.

 2          THE COURT:  Okay.  So you have a number of relatives

 3    who have been in prison.

 4          PROSPECTIVE JUROR PAYTON:  Yes.

 5          THE COURT:  Have you talked to anyone about their

 6    particular experiences in prison?

 7          PROSPECTIVE JUROR PAYTON:  Not particularly.  I

 8    mean, I know what they were there for.  I know that they

 9    deserve to be there because they did commit the crime that

10    they were accused of.  They did their time, and, you know,

11    there's really nothing to talk about on that score.

12          THE COURT:  Do you know whether any of them became

13    involved in any kind of altercation while they were in prison?

14          PROSPECTIVE JUROR PAYTON:  My brother was stabbed

15    while he was in prison.  They had a riot, even though he

16    wasn't in it.  Because he wasn't in it, I think he got

17    stabbed, but he's okay.

18          THE COURT:  Is there anything about those

19    experiences that makes you think you couldn't be fair in this

20    case?

21          PROSPECTIVE JUROR PAYTON:  Not really, your Honor.

22    I'm a pretty fair person.

23          THE COURT:  Okay.  Thank you.

24          And I see a couple more hands.  Let's go to Juror

25    No. 6 first, and then we'll go back down to Juror No. 1.

1          PROSPECTIVE JUROR PLASTER:  My mom was convicted of

2     a crime.  I don't actually know what the -- it's either theft

3     or burglary, something to that effect, but I was very much

4     separated from it.  So I don't know the details of it at all.

5     She didn't serve any time in jail or prison.

6          THE COURT:  Okay.  Anything about that that makes

7     you think you couldn't be fair here?

8          PROSPECTIVE JUROR PLASTER:  No.

9          THE COURT:  Okay.  Let's get that microphone down to

10    Juror No. 1.

11         PROSPECTIVE JUROR HIBNER:  Concerning accused of,

12    there have been several times I've been investigated or asked

13    questions about sexual abuse.  My own either children or

14    adults.

15         THE COURT:  Okay.  And is there anything about that

16    that makes you think you couldn't be fair here?

17         PROSPECTIVE JUROR HIBNER:  No.

18         THE COURT:  Okay.  Anybody else in this?  Juror No.

19    12.

20         PROSPECTIVE JUROR COLLINGE:  I have a nephew who was

21    in the L.A. jail for 60 days for DUI.

22         THE COURT:  Did he talk to you at all about that

23    experience?

24         PROSPECTIVE JUROR COLLINGE:  He wasn't happy about

25    it, and he doesn't want to go back.

1          THE COURT:  Okay.  That's part of the purpose.

2          PROSPECTIVE JUROR COLLINGE:  Hopefully, yes.

3          THE COURT:  Anything about that that makes you think

4    you couldn't be fair?

5          PROSPECTIVE JUROR COLLINGE:  No.

6          THE COURT:  And did I miss anybody here?  How about

7    out here?  Let's start with Juror No. 18.

8          PROSPECTIVE JUROR DILLON:  My father was convicted

9    of child abuse and spent time in jail.

10         THE COURT:  Do you know -- was that long ago?

11         PROSPECTIVE JUROR DILLON:  It was when I was very

12   young.

13         THE COURT:  Okay.  And have you ever talked to him

14   about that experience?

15         PROSPECTIVE JUROR DILLON:  I haven't seen him since.

16         THE COURT:  Okay.  Is there anything about that that

17   makes you think you couldn't be fair in this case?

18         PROSPECTIVE JUROR DILLON:  No.

19         THE COURT:  Okay.  And did I see another hand out

20   there?

21         PROSPECTIVE JUROR FLOWERS:  I have a cousin that's

22   in jail now for -- I believe he beat up someone with a

23   baseball bat.

24         THE COURT:  Juror No. 16, have you talked to him

25   about that situation?

```
 1          PROSPECTIVE JUROR FLOWERS:  No, I haven't.

 2          THE COURT:  Is there anything about that that makes

 3  you think you couldn't be fair?

 4          PROSPECTIVE JUROR FLOWERS:  No.

 5          THE COURT:  Did I miss anybody?

 6          Okay.  Other than what we've already heard, have

 7  you, a relative, or a close friend ever been an inmate in a

 8  prison, jail, or correctional facility?  Anything new we

 9  didn't hear yet?

10          Okay.  Have you -- I guess we've heard a little bit

11  about this.  Have you ever visited a jail, a prison, or a

12  correctional facility other than what we've already heard?

13  And Juror No. 1?

14          PROSPECTIVE JUROR HIBNER:  Well, in the -- in my job

15  I would have to visit the city jails and prisons.  Either to

16  interview people or to take children to visit their parents.

17          THE COURT:  Did you ever observe any kind of

18  altercation or get involved with any kind of altercation in

19  those circumstances?

20          PROSPECTIVE JUROR HIBNER:  No, not in the

21  correctional facilities.

22          THE COURT:  Okay.  Anybody else?  Juror No. 9.

23          PROSPECTIVE JUROR DILLON:  I went to visit that same

24  brother in jail.  The only problem I had is they made me take

25  off my hair.  My ponytail.  It wasn't real.  So you couldn't
```

1   wear those in prison.  So that was my only issue.  The next

2   time I went all natural.

3            THE COURT:  Okay.  Anybody else?

4            How about out here?

5            All right.  Other than what we might have already

6   heard, do you believe that you, a relative, or a close friend

7   has ever been treated badly by government, law enforcement, or

8   the courts?  Anybody over here?  Anybody out here?

9            Great.  Has anyone here, a relative, or a close

10  friend ever been the victim of a crime?  Anybody in the back

11  row there?  Second row.  Juror No. 7.

12           PROSPECTIVE JUROR WESSON:  I'm the victim of a rape,

13  and I had a sister who was murdered.  And in testifying, I

14  testified in the case, my own case, and then a later case

15  involving the same defendant.

16           THE COURT:  And was the person convicted?

17           PROSPECTIVE JUROR WESSON:  Yes.

18           THE COURT:  Was the person who murdered your sister

19  found?

20           PROSPECTIVE JUROR WESSON:  No.

21           THE COURT:  Any bad feelings for either side against

22  the prosecution because they didn't find your sister's

23  murderer or against the defense?

24           PROSPECTIVE JUROR WESSON:  No.

25           THE COURT:  And I saw another hand.  Juror No. 9.

1          PROSPECTIVE JUROR DILLON:  Okay.  My sister was

2    viciously attacked, and her eye was put out.  And so she lost

3    an eye.  And I've had a cousin murdered on the beach.  That's

4    where they found her body.  I had a cousin who was murdered in

5    Vegas.  They never found the perpetrator.  I have no hard

6    feelings of the people who haven't found them or anything like

7    that.

8          THE COURT:  Okay.  Would that affect your ability to

9    be fair in this case?

10          PROSPECTIVE JUROR DILLON:  Not really, no.

11          THE COURT:  You were sounding a little --

12          PROSPECTIVE JUROR DILLON:  One more thing.  Just so

13    I won't have to speak next time.  Yes, I am a big fan of

14    Court TV or True TV.  I've seen Shawshank Redemption.  I watch

15    a lot of True TV.  Just so you know.

16          THE COURT:  Okay.  We all know that it's not

17    necessarily true just because they say that.

18          PROSPECTIVE JUROR DILLON:  Well, yes, of course.

19          THE COURT:  All right.  Anybody else for someone for

20    the victim of crimes?

21          Juror No. 12.

22          PROSPECTIVE JUROR COLLINGE:  I had my house broken

23    into and things stolen.  And my brother had his car stolen and

24    burned with somebody's body in it.  We don't know whose.  It

25    was a long time ago.

1              THE COURT:  Were the people who were involved in

2    those things caught?

3              PROSPECTIVE JUROR COLLINGE:  We don't know.

4              THE COURT:  Okay.  And any hard feelings one way or

5    the other that would impact your ability to be fair?

6              PROSPECTIVE JUROR COLLINGE:  No.

7              THE COURT:  Juror No. 16.

8              PROSPECTIVE JUROR FLOWERS:  I have a cousin who was

9    shot, and I had a vehicle stolen.

10             THE COURT:  Was anyone caught in either one of those

11   incidents?

12             PROSPECTIVE JUROR FLOWERS:  Not in my vehicle.  But

13   the person who shot my cousin was caught.

14             THE COURT:  Did you participate in the trial at all?

15             PROSPECTIVE JUROR FLOWERS:  No, not at all.

16             THE COURT:  Anything about those things that makes

17   you think you couldn't be fair in this case?

18             PROSPECTIVE JUROR FLOWERS:  No, not at all.

19             THE COURT:  Juror No. 14.

20             PROSPECTIVE JUROR CLIFT:  My mother-in-law was beat

21   up.

22             THE COURT:  Was that recently or a long time ago?

23             PROSPECTIVE JUROR CLIFT:  20 years ago.

24             THE COURT:  Was that person caught?

25             PROSPECTIVE JUROR CLIFT:  Yes.

1          THE COURT:  And is there anything about that that

2   would cause you to be unfair in this case?

3          PROSPECTIVE JUROR CLIFT:  No.

4          THE COURT:  Okay.  Other than what we might have

5   already heard, anybody here, you, a relative or close friend,

6   ever testified in a criminal case?  And Juror No. 1, anything

7   other than what you've already told us, sir?

8          PROSPECTIVE JUROR HIBNER:  Yes.  I have a Superior

9   Court judge who has testified in criminal cases.

10         THE COURT:  Okay.  Anybody else?

11         Okay.  And that next question, we have one answer

12  already.  But anybody watch those television programs, movies,

13  et cetera, like Prison Break, Oz, Shawshank Redemption, any

14  documentaries about prison or the correctional system?  And if

15  so, I'll ask you whether that would influence you in any way.

16  Anybody in the back row?  Juror No. 3.

17         PROSPECTIVE JUROR SPENCE:  I certainly have seen

18  those, but they wouldn't affect my decision in any way, I

19  don't think.

20         THE COURT:  Okay.  Anybody else?  Juror No. 4.

21         PROSPECTIVE JUROR THOMAS:  Same answer.  I've seen

22  documentaries and Shawshank Redemption.  It won't affect my

23  decision.

24         THE COURT:  Thank you.

25         Juror No. 6?

```
 1              PROSPECTIVE JUROR PLASTER:  Same thing.  I've seen

 2    TV documentaries, but it wouldn't affect my decision at all.

 3              THE COURT:  Okay.  And the next row, Juror No. 13.

 4              PROSPECTIVE JUROR SANCHEZ:  I've only seen the

 5    fictional ones because I don't like documentaries.  So it

 6    wouldn't affect me.

 7              THE COURT:  All right.

 8              PROSPECTIVE JUROR SANCHEZ:  Because I know it's

 9    fiction.

10              THE COURT:  Anybody else in that row?  How about out

11    here?

12              Juror No. 14.

13              PROSPECTIVE JUROR CLIFT:  Shawshank Redemption.  But

14    it wouldn't affect me.

15              THE COURT:  Okay.  Anybody else?

16              Okay.  Have you seen any movies or programs about

17    the criminal justice system in general, that's broader than

18    talking about prisons, that would influence you in any way or

19    prevent you from making your decision based on the facts as

20    you determined them and the law as I give it to you?

21              I don't see any hands.

22              You've heard a little bit about the charges in this

23    case.  Do you have any feelings about the particular charges

24    against this defendant that would make it difficult for you to

25    be a fair and impartial juror in this case?
```

1          Does everyone understand that defendants in our

2    system have an absolute right not to testify?

3          No one has a problem with that right?

4          I want you to take a minute and picture yourself

5    sitting at these tables in front of me, the prosecution, the

6    defense.  If you were sitting at those tables trying to select

7    a fair and impartial jury, is there anything about yourself

8    you would want to know even if I haven't asked a question to

9    bring it out?  Any reason at all you can't be fair and

10   impartial?

11         I don't see any hands.

12         Ms. Sanneman, would you like a few minutes?

13         MS. SANNEMAN:  Yes.

14         MR. GOLDMAN:  Your Honor, I was wondering if we

15   might have a brief recess.

16         THE COURT:  All right.  Why don't we take a

17   15-minute recess.  Please don't form any opinions about the

18   case or talk to anybody about it until the matter is finally

19   submitted to you.

20         We'll be in recess.

21         (Recess taken.)

22         THE COURT:  Everyone is present.

23         Ms. Sanneman, would you like a few minutes?

24         MS. SANNEMAN:  Yes, please, your Honor.  I just have

25   a few questions.

1          Just a few brief questions for you.  The first one

2    is do you think that someone who hits a prison guard should

3    not be held accountable because, for instance --

4          MR. GOLDMAN:  Your Honor, I'm going to object to

5    this line of questioning.  Because it's the government's

6    theory of the case.

7          THE COURT:  Why don't you approach.

8          **(SIDEBAR CONFERENCE HELD.)**

9          THE COURT:  What are you going to ask?

10         MS. SANNEMAN:  It's the same question.  Do you think

11   that someone who hits a prison guard should not be held

12   accountable because, for instance, you think that prison

13   guards would expect such problems while guarding inmates?

14         MR. GOLDMAN:  The question posits a fact to the jury

15   that is not in evidence.  We don't have any evidence that he

16   hit the prison guard.  Their theory of the case is that he

17   did.  And now she's asking questions which makes them assume

18   or leads them to assume that it happened.  That's why I would

19   object based on that.

20         THE COURT:  Overruled.

21         **(CONCLUSION OF SIDEBAR CONFERENCE.)**

22         THE COURT:  You may proceed.

23         MS. SANNEMAN:  Do you think that while guarding

24   inmates, someone who hits a prison guard should not be held

25   accountable?  Does anyone feel that way?

1             Seeing no hands.

2             Do you think that if a person is attacked and

3    doesn't suffer extremely severe injuries as a result, then the

4    attacker should not be held accountable for his or her crimes?

5             All right.  Seeing no hands.

6             Have any of you seen the show CSI or anything

7    similar?

8             I have seen it.  It's a good show.

9             Does anyone feel that the same techniques used in

10   CSI should be used in a real life investigation or

11   investigations?

12            You didn't hear the question?

13            PROSPECTIVE JUROR COLLINGE:  I don't understand what

14   you mean.

15            THE COURT:  It's kind of a broad question.

16            MS. SANNEMAN:  I'll try and narrow it.  CSI from my

17   viewing of it has some very high techniques in my opinion.

18   I'm just wondering if anyone here expects that law enforcement

19   investigations would employ those same techniques.

20            Would everyone here be comfortable with convicting

21   someone of a crime if you believed beyond a reasonable doubt

22   that the person did it, but you don't think that he had

23   necessarily a good reason for doing it?  Would there -- is

24   there anyone --

25            THE COURT:  I don't even understand that question.

1          MS. SANNEMAN:  I guess what I'm trying to ask is

2     sometimes someone might do something that doesn't make sense,

3     you know, that they did it, and you know that beyond a

4     reasonable doubt.  Would you still have a problem convicting

5     that person even if you didn't understand his or her

6     motivation?

7          All right.  Lastly and briefly, does anyone here

8     feel that all heterosexual men are somehow prejudiced against

9     or fear all homosexual men?

10         Anyone?

11         Okay.  Thank you.  Those are all my questions.

12         THE COURT:  Mr. Goldman.

13         MR. GOLDMAN:  Thank you, your Honor.  Good morning,

14    ladies and gentlemen.  My name is Richard Goldman, and this is

15    my client, Daniel Osazuwa.  And I have a few questions to ask

16    you.

17         One of the things that I'm concerned about or that

18    worries me is that somehow Mr. Osazuwa won't get the

19    presumption of innocence afforded to him because there will be

20    information that comes out that this incident occurred two and

21    a half years ago when he was in jail.

22         Does anyone feel that because he was in jail two and

23    a half years ago, that somehow what he's accused of in this

24    case he's not entitled to the presumption of innocence?  Is

25    someone bothered by that?

1            Okay.  So Mr. Hibner, how do you feel about that?

2            PROSPECTIVE JUROR HIBNER:  It's a strange world.

3    And you just wait until you find out the facts before you make

4    any conclusions.

5            MR. GOLDMAN:  Okay.  Mr. -- is it Spence?

6            PROSPECTIVE JUROR SPENCE:  Yes.

7            MR. GOLDMAN:  What do you think about that question?

8            PROSPECTIVE JUROR SPENCE:  I don't think I'd have

9    any problem about that.

10           MR. GOLDMAN:  Okay.  Ms. Thomas?

11           PROSPECTIVE JUROR THOMAS:  I'm not going to judge

12   anyone until I hear the facts.

13           MR. GOLDMAN:  Okay.

14           Ms. Payton?

15           PROSPECTIVE JUROR PAYTON:  I would have to hear the

16   facts of the case.

17           MR. GOLDMAN:  All right.  Fair enough.

18           Mr. Hibner, I have a specific question for you.  You

19   said that you conducted investigations; is that right?  In

20   your job?

21           PROSPECTIVE JUROR HIBNER:  Yes.

22           MR. GOLDMAN:  And you wrote reports?

23           PROSPECTIVE JUROR HIBNER:  Yes.

24           MR. GOLDMAN:  And you made determinations as -- if

25   you thought someone did something or you thought someone

1    didn't do something?

2              PROSPECTIVE JUROR HIBNER:  No.

3              THE COURT:  Could you explain?

4              PROSPECTIVE JUROR HIBNER:  I just reported

5    information.  It was the judge's authority to make any

6    decisions concerning information that I collected.

7              MR. GOLDMAN:  Okay.  And did you come up with

8    conclusions after you interviewed witnesses and make

9    recommendations to the judge?

10             PROSPECTIVE JUROR HIBNER:  No.  I would provide

11   information to the Court and make some recommendations.

12             MR. GOLDMAN:  All right.  And were there instances

13   where you thought that charges shouldn't be brought or that

14   you thought charges should be brought?

15             PROSPECTIVE JUROR HIBNER:  That's a very -- that

16   wasn't my job.  And all I can say is there were a lot of

17   cases, and that doesn't make any sense to me.  It was my job

18   just to collect the information that was presented in court

19   and answer any questions concerning it.

20             MR. GOLDMAN:  Okay.  I have a general question for

21   the people who have been asked questions.  Or anyone for that

22   matter here.  Has anyone ever done anything so embarrassing

23   that you just didn't want anyone to find out because it would

24   just be too much?  The shame would be too much?  It would be

25   open to having people tease you.  Has that happened to anyone

1   where it's like oh, my God, I don't want anyone to find out

2   about this.  Can I see a show of hands if anyone has had a

3   situation like that?

4           Now, I'm not going to ask you what happened.

5           THE COURT:  You should have said that before.

6           MR. GOLDMAN:  Because Judge Fischer said one of the

7   first things was look, I don't want to embarrass any of you.

8   And I don't either.  But what I'm asking is a general

9   question.  Has anything happened that's so embarrassing,

10  without telling us, that you're just like oh, my God, I just

11  don't want anyone to know?

12          And can I see a show of hands?

13          Okay.  How about letting me ask this another way.

14  Has anything like this happened to anyone you know, similar

15  situation.  Something so embarrassing that they thought oh, my

16  God, no one can find out what happened.  Otherwise, I'll just

17  never hear the end of it.  Show of hands on that one?

18          Okay.  Ms. Thomas.

19          PROSPECTIVE JUROR THOMAS:  I have a very close

20  friend who was abducted, and she doesn't know what happened to

21  her.  She was drugged.  And she has PTSD, and I think only two

22  people know of this, and I'm one of them because she's so

23  embarrassed that it happened.  She still thinks it's her

24  fault.

25          MR. GOLDMAN:  Okay.  Anyone else know someone who

1    had something embarrassing?  And it doesn't have to be extreme

2    like that.  It could just be you're walking and you fall or

3    you just do something that's so embarrassing or spill paint on

4    yourself.  Anything like that?

5              Ms. Wesson.

6              PROSPECTIVE JUROR WESSON:  Hey, I worked for 40

7    years.  We often said things or did things that had outcomes

8    that weren't so good, and we just said oh, I hope no one finds

9    out that was my idea.

10             MR. GOLDMAN:  Okay.  Anyone else?

11             Ms. Plaster, no?

12             PROSPECTIVE JUROR PLASTER:  I can't think of a --

13             MR. GOLDMAN:  A friend.  Not you.

14             PROSPECTIVE JUROR PLASTER:  Oh, not that I can think

15   of.

16             MR. GOLDMAN:  The prosecutor asked you a question,

17   asked the jurors a question regarding seeing CSI, and I think

18   a lot of you raised your hands.  Could I see the people that

19   raised their hands about have they watched CSI.  And she asked

20   you about the techniques that the police use; right?  And she

21   said would you require the same techniques that the police

22   used.  Let me ask this question another way.

23             You heard Judge Fischer say that the prosecution has

24   the burden of proving its case beyond a reasonable doubt.

25   Does everyone feel comfortable with the fact that the

1    prosecution has to prove its accusation?  Is that something

2    that everyone is okay with?  Okay.  So if the prosecution has

3    to prove its accusation, would you require proof?  Make you

4    want to see some evidence that something happened?  And

5    I'll -- Ms. Lau, you're an attorney?

6              PROSPECTIVE JUROR LAU:  Right.

7              MR. GOLDMAN:  You do civil work?

8              PROSPECTIVE JUROR LAU:  Right.

9              THE COURT:  Do you go to trial?

10             PROSPECTIVE JUROR LAU:  Not very often.

11             THE COURT:  But in civil work, when you have to

12   prove a case, the burden of proof in a civil case is usually a

13   preponderance of evidence?

14             PROSPECTIVE JUROR LAU:  Correct.

15             MR. GOLDMAN:  So that means a little bit more.  But

16   in a criminal case, it's proof beyond a reasonable doubt,

17   which is the highest standard of proof that we have in our

18   legal system?

19             PROSPECTIVE JUROR LAU:  Correct.

20             MR. GOLDMAN:  And the burden is on the prosecution

21   to bring the proof beyond a reasonable doubt.

22             PROSPECTIVE JUROR LAU:  Correct.

23             MR. GOLDMAN:  Do you have a problem with that?

24             PROSPECTIVE JUROR LAU:  No.

25             MR. GOLDMAN:  You have a lot of friends who are

1    police officers.  You talk to them about what they do for a

2    living?

3              PROSPECTIVE JUROR LAU:  I do.

4              MR. GOLDMAN:  And I think Ms. Clift, you, too, have

5    family and friends -- I'm sorry.  Mr. Clift.  Ms. Stepan, you

6    have friends who are police officers and probation officers.

7    Mr. Clift, you, too.

8              You heard their version of what happened; right?

9    Would you require in this case the prosecution to prove its

10   case beyond a reasonable doubt?  Is that something that you

11   are comfortable with?

12             PROSPECTIVE JUROR CLIFT:  Yes.

13             MR. GOLDMAN:  And, Ms. Lau, would you require the

14   prosecution to prove its case beyond a reasonable doubt?

15             PROSPECTIVE JUROR LAU:  Yes.

16             MR. GOLDMAN:  And if there wasn't proof, how would

17   you vote?

18             PROSPECTIVE JUROR LAU:  If there wasn't proof, I'd

19   have to follow the instructions of the Court.

20             MR. GOLDMAN:  And if there wasn't proof beyond a

21   reasonable doubt?

22             PROSPECTIVE JUROR LAU:  I'd follow the instructions

23   of the Court.

24             MR. GOLDMAN:  And if there wasn't enough evidence to

25   prove beyond a reasonable doubt --

1          PROSPECTIVE JUROR LAU:  I'd find the defendant not

2  guilty.

3          MR. GOLDMAN:  With testimonial evidence?  Let me

4  rephrase the question.  With real evidence; right?  With solid

5  evidence?

6          PROSPECTIVE JUROR LAU:  Yes.

7          MR. GOLDMAN:  And if they couldn't do that?

8          PROSPECTIVE JUROR LAU:  I would have to find a not

9  guilty verdict.

10          MR. GOLDMAN:  Mr. Spence, how would you feel about

11  what I said?  Would you require proof from the prosecution in

12  this case?

13          PROSPECTIVE JUROR SPENCE:  Yes, I think I would.

14          MR. GOLDMAN:  Beyond a reasonable doubt?

15          PROSPECTIVE JUROR SPENCE:  Yes.

16          MR. GOLDMAN:  And would you feel comfortable saying

17  I don't think they have proven this case beyond a reasonable

18  doubt, and I'm going to find Mr. Osazuwa not guilty?

19          PROSPECTIVE JUROR SPENCE:  Yes.

20          MR. GOLDMAN:  Does everyone feel the same way, that

21  if the prosecution did not prove its case beyond a reasonable

22  doubt, you'd feel comfortable saying we think Mr. Osazuwa is

23  not guilty?  Could I see a show of hands to that, if everyone

24  feels comfortable with that?

25          Thank you, your Honor.

```
 1              THE COURT:  Pass for cause?

 2              MS. SANNEMAN:  No, your Honor.

 3              THE COURT:  Pass for cause?

 4              MS. SANNEMAN:  Pass.

 5              THE COURT:  Mr. Goldman?

 6              MR. GOLDMAN:  Yes, we pass for cause.

 7              THE COURT:  Peremptory is with the government.

 8              MR. GOLDMAN:  Your Honor, may we approach on this?

 9              THE COURT:  Yes.

10              (SIDEBAR CONFERENCE HELD.)

11              MS. SANNEMAN:  Do you normally do the peremptories

12    out loud?

13              THE COURT:  Yes.

14              MR. GOLDMAN:  I didn't know if you wanted us to come

15    up to sidebar.  I never like to make anyone feel bad when we

16    say "we thank and excuse."

17              THE COURT:  We're doing it in open court.

18              MR. GOLDMAN:  Thanks, your Honor.

19              MS. SANNEMAN:  Your Honor, I'm sorry.  Just so I

20    don't get ahead of myself, we are following -- I have one, and

21    the defendant has two, and that's the order we're going?

22              THE COURT:  Yes.

23              (CONCLUSION OF SIDEBAR CONFERENCE.)

24              MS. SANNEMAN:  Government would like to excuse Juror

25    No. 9.
```

1          THE COURT:  You are excused and ordered to return to

2     the jury room.

3          Juror No. 13, I'd ask you to come up here, and

4     you'll now be Juror No. 9.

5          Peremptory is with the defense.

6          MR. GOLDMAN:  Your Honor, we would excuse Juror

7     No. 12.

8          THE COURT:  You are excused.  Thank you very much.

9     Juror No. 14, please take seat number 12.  You are now Juror

10    No. 12.  And the peremptory is again with the defense.

11         MR. GOLDMAN:  Your Honor, we thank and excuse Juror

12    No. 7.

13         THE COURT:  You are excused and ordered to return to

14    the jury room.  Juror No. 16, please take seat No. 7.  You are

15    now Juror No. 7.

16         MS. SANNEMAN:  We'd like to excuse Juror No. 4.

17         THE COURT:  Juror No. 4, thank you very much.

18         MR. GOLDMAN:  May I approach briefly?

19         **(SIDEBAR CONFERENCE HELD.)**

20         MR. GOLDMAN:  Okay.  Your Honor, I'm going to make a

21    motion under <u>Batson</u> with respect to the prosecution's

22    peremptory challenge with respect to Juror No. 4 based on her

23    sexual orientation.  There was nothing in what she said during

24    the course of the examination that indicated that she couldn't

25    be anything more than fair and impartial.  The only

1   information that came out was that she had a domestic partner

2   in this case -- excuse me.  That she had a domestic partner,

3   and in this case there is the issue with respect to

4   homosexuality.

5           So I would move under Batson under that category of

6   sexual orientation and ask the Court to require the

7   prosecution to explain its peremptory challenge with respect

8   to Juror No. 4.

9           THE COURT:  I'm not sure you've really laid a

10  sufficient case for a prima facie case.  But I'll ask

11  Ms. Sanneman to explain why she picked Juror No. 4.

12          MS. SANNEMAN:  Sure.  Juror No. 4 indicated that she

13  had some very close Nigerian friends, and it sounded -- I was

14  just concerned about her knowledge of them and if that would

15  affect her ability to judge this case.  I was also concerned

16  about the fact that she is single and, you know, doesn't seem

17  necessarily -- no prior jury service, and that was pretty much

18  it.

19          THE COURT:  Well, there are other single people who

20  have no prior jury service, but she was the only juror who had

21  extremely favorable experiences with Nigerians.  So I think

22  that's a legitimate reason to excuse her on a peremptory

23  challenge, and I accept that as an explanation.  The motion is

24  denied.

25              **(CONCLUSION OF SIDEBAR CONFERENCE.)**

1          THE COURT:  Juror No. 16, please take seat No. 4.

2     You are now Juror No. 4.  And the peremptory is with the

3     defense.

4          MR. GOLDMAN:  Your Honor, could I ask the Court to

5     repeat what juror is in seat No. 4 now?

6          THE COURT:  Juror No. 16, Ms. Flowers.

7          MR. GOLDMAN:  Your Honor, we would -- the defense

8     would thank and excuse Juror No. 1 and Juror No. 2.

9          THE COURT:  Juror No. 1, you are excused.  Please

10    return to the jury room.  Juror No. 17, please take seat No.

11    1.  You are now Juror No. 1.  And Juror No. 2, you are

12    excused.  Please return to the jury room, and Juror No. 18,

13    please take seat No. 2.  You are now Juror No. 2.

14         And the peremptory is with the government.

15         MS. SANNEMAN:  Your Honor, may I have a moment?

16         THE COURT:  Yes.

17         MS. SANNEMAN:  The government would like to thank

18    and excuse juror number -- who is now Juror No. 2.

19         THE COURT:  Juror No. 2, thank you very much.  You

20    are excused.  You are asked to return to the jury room.

21         And Ms. Plato will fill our empty seats starting

22    with seat No. 2.

23         THE CLERK:  Juror No. 2, Darlin Khom.

24         And then starting with the bench, Juror No. 13,

25    Anita Chin.

```
1              Juror No. 14, Myung Kim.

2              Juror No. 15, Vicki Stuart.

3              Juror No. 16, Carl Foote.

4              Juror No. 17, Andrew Miller.  And,

5              Juror No. 18, Varoujan Boghossian.

6              THE COURT:  Let's start off with our new Juror No. 2

7    and get the information just on that single sheet of paper.

8              PROSPECTIVE JUROR KHOM:  My name is Darlin Khom.  I

9    am from Long Beach.  I have an Associate's degree in nursing.

10   I work with Cambrin Home Care.  I'm single.  My dad is a

11   social worker with the County of Los Angeles.  My mom is a

12   stay at home.  I have never had any prior jury service nor

13   Grand Jury service.

14             THE COURT:  Thank you.  Our new Juror No. 13.

15             PROSPECTIVE JUROR CHIN:  I live in Palms in

16   Los Angeles.  I have a Bachelor's degree in business.  I am a

17   marketing research consultant.  We do work with attorneys for

18   IP litigation and likelihood of confusion, secondary meaning,

19   those types of research projects, mostly consumer goods.  Some

20   class action suits.  I am single.  I have a roommate.  He

21   works in business management, in entertainment.  I have no

22   prior jury service or Grand Jury experience.

23             THE COURT:  Thank you.  Juror No. 14.

24             PROSPECTIVE JUROR KIM:  My name is Myung.  I live in

25   Gardena, and I'm working at the CitiBank.  And I'm a teller.
```

1    I'm married.  I had college in my country.  My husband works

2    as a technician in the IT.  The case -- I don't know, the --

3    somebody printing the marijuana stuff I did once.  And no

4    Grand Jury.

5            THE COURT:  You were on a criminal jury that had

6    something to do with marijuana?

7            PROSPECTIVE JUROR KIM:  Yes.

8            THE COURT:  Was there a verdict?  Don't tell me what

9    it was.

10           PROSPECTIVE JUROR KIM:  Yes.

11           THE COURT:  Juror 15.

12           PROSPECTIVE JUROR STEWART:  My name is Vicki

13   Stewart.  I live in Arleta, California.  I have an Associate's

14   degree.  I work for Los Angeles Pierce College as a case

15   manager.  I'm divorced.  One of my adult sons lives with me,

16   and he's a fabricator.  My other adult children, one does

17   marketing.  And another one is a music producer.  I have been

18   on a criminal case before.  The charge was rape, and the

19   person was found guilty.  I've also been on a Grand Jury.  And

20   the person was also found guilty.

21           THE COURT:  Well, Grand Juries don't find people

22   guilty.

23           PROSPECTIVE JUROR STEWART:  Grand Jury is a federal

24   case?

25           THE COURT:  Grand Jury is a whole different process.

1    Usually, there's a lot more people, and you just decide

2    whether there's probable cause.

3            PROSPECTIVE JUROR STEWART:  Okay.  I misunderstood.

4    I've been here in Federal Court.

5            THE COURT:  Was that a criminal case?

6            PROSPECTIVE JUROR STEWART:  I believe so.  I don't

7    really remember.

8            THE COURT:  Okay.  And you said you're divorced.

9    What did your husband do when you were together?

10           PROSPECTIVE JUROR STEWART:  Oh, gosh, not much of

11   anything.

12           THE COURT:  Okay, then.  Juror No. 16.

13           PROSPECTIVE JUROR FOOTE:  Carl Foote.  Sierra Madre,

14   Master's of Business Administration.  Employer is Glen Air

15   Incorporated.  I'm an operations manager.  Married.  My wife

16   is a retail merchandiser.  Two previous criminal trials.  The

17   charges were burglary and drug possession.  Reached a verdict

18   in both cases.  No Grand Jury experience.

19           THE COURT:  Were there verdicts in your cases?

20           PROSPECTIVE JUROR FOOTE:  Yes.

21           THE COURT:  Juror No. 17.

22           PROSPECTIVE JUROR MILLER:  Andrew Miller.  Pasadena.

23   Senior in college.  I work at a warehouse in Long Beach.

24   Clothing warehouse.  Single.  Nobody lives with me.  And no

25   jury experience.

1          THE COURT:  Thank you.

2          Juror No. 18.

3          PROSPECTIVE JUROR BOGHOSSIAN:  Varoujan Boghossian.

4    I live in Northridge.  I have school plus technical college.

5    My employer's name is Wegner Engineering and Surveying.  My

6    occupation is plan and construction surveying.  My son lives

7    in our house, and he has -- he does computer animation.  I

8    don't have any prior jury service.

9          THE COURT:  All right.  Thank you.  Let's turn to

10   that longer list of questions that I was asking you to pay

11   attention so that I could just ask you why your answers could

12   be similar.  So let's look at those very general questions,

13   questions 1 through 9, and refresh your memory as to what

14   those were.

15         And let me know if you had any yes answers to those

16   questions 1 through 9.  Raise your hand if you have a yes

17   question.

18         All right.  I don't see any hands.  How about that

19   question No. 10, about any law enforcement, court-related

20   contacts with you, relatives, or close friends.  Any of our

21   new jurors have an answer to that?

22         Juror No. 2.

23         PROSPECTIVE JUROR KHOM:  My boyfriend is currently

24   in applications with L.A.P.D.  And then I have a cousin who is

25   with the Oakland P.D.

```
 1              THE COURT:  All right.  Anything about those things
 2    that makes you think you can't be fair in this case?
 3              PROSPECTIVE JUROR KHOM:  No.
 4              THE COURT:  Okay.  How about anybody out here?
 5              I see Juror No. 13.
 6              PROSPECTIVE JUROR CHIN:  I have close friends who
 7    are federal air marshals and a close friend who is a detective
 8    in Nevada.
 9              THE COURT:  Do you talk to any of them about the
10    work they do?
11              PROSPECTIVE JUROR CHIN:  No.
12              THE COURT:  Okay.  Anything about that that makes
13    you think you couldn't be fair in this case?
14              PROSPECTIVE JUROR CHIN:  No.
15              THE COURT:  Okay.  Great.
16              Who else had a hand up out there?  Juror No. 14.
17              PROSPECTIVE JUROR KIM:  My nephew is a police
18    officer.
19              THE COURT:  Is that locally?
20              PROSPECTIVE JUROR KIM:  Yes.
21              THE COURT:  Is there anything about that that makes
22    you think you could not be fair in this case?
23              PROSPECTIVE JUROR KIM:  No.
24              THE COURT:  Great.  Thank you.
25              And who else?  Juror No. 16?
```

```
 1          PROSPECTIVE JUROR FOOTE:  I have a nephew who is a

 2   corrections officer in Texas.  No reason it would make me --

 3          THE COURT:  Has he ever talked to you about his job?

 4   Has he had any altercations?

 5          PROSPECTIVE JUROR FOOTE:  Yes, he has.

 6          THE COURT:  And anything about that that makes you

 7   think it would impact your judgment here?

 8          PROSPECTIVE JUROR FOOTE:  Nothing at all.

 9          THE COURT:  Great.

10          Anybody else out there?

11          Question No. 10.

12          Okay.  How about question No. 11.  Any relatives,

13   close friends, or you work for the federal government?  I

14   don't see any hands.

15          How about opinions about employees of the FBI or the

16   Bureau of Prisons that would prevent you from judging their

17   testimony the same way you would anybody else?

18          I don't see any hands.  Have you had any experience

19   with a law enforcement officer where the officer was not

20   telling the truth?

21          Would the fact that a witness is a law enforcement

22   officer make you more or even less likely to believe his or

23   her testimony?

24          Do you have any difficulty or embarrassment

25   returning a verdict for or against the government because the
```

1    government has law enforcement officers as witnesses?

2            Have you, a relative, or close friend ever been

3    accused of, charged with, or convicted of a crime?

4            Juror No. 2.

5            PROSPECTIVE JUROR KHOM:  My sister is currently

6    serving time in state prison.

7            THE COURT:  What's your sister in prison for?

8            PROSPECTIVE JUROR KHOM:  Robbery.

9            THE COURT:  And did you talk to her at all or

10   participate in the trial?

11           PROSPECTIVE JUROR KHOM:  I talked to her about it.

12   I didn't participate in the trial.

13           THE COURT:  Did you have any feelings about whether

14   she was treated fairly or poorly by the system?

15           PROSPECTIVE JUROR KHOM:  No.

16           THE COURT:  Have you visited her in jail or prison?

17           PROSPECTIVE JUROR KHOM:  Yes, I visited her a few

18   times.

19           THE COURT:  Is there anything about that experience

20   that makes you think you could not be fair here?

21           PROSPECTIVE JUROR KHOM:  No.

22           THE COURT:  Anybody else out here?

23           Juror No. 15.

24           PROSPECTIVE JUROR STEWART:  I had a nephew that was

25   arrested for vandalism.  And also my sister was arrested for

1    child endangerment.

2           THE COURT:  And were either one of them put in jail?

3           PROSPECTIVE JUROR STEWART:  The nephew was.  For my

4    sister, the charges were dropped.

5           THE COURT:  Either one of those circumstances make

6    you think you can't be fair in this case?

7           PROSPECTIVE JUROR STEWART:  No.

8           THE COURT:  Juror No. 13.

9           PROSPECTIVE JUROR CHIN:  A friend of mine was

10   arrested for DUI, and my mom was arrested for domestic

11   violence.

12          THE COURT:  Did either one of them spend time in

13   jail, do you know?

14          PROSPECTIVE JUROR CHIN:  I think it was like a day,

15   an overnight thing.

16          THE COURT:  Okay.  Would either one of those things

17   cause you to be unfair in this case?

18          PROSPECTIVE JUROR CHIN:  No.

19          THE COURT:  Anybody I missed?  Okay.  Have you, a

20   relative, or a close friend ever been an inmate in prison,

21   jail, or correctional facility or ever visited prison, jail,

22   or facility other than what we've already heard?

23          Okay.  And does anyone here believe you, a relative,

24   or a close friend has ever been treated badly by government,

25   law enforcement, or the courts?  Any bad experiences?

1          Okay.  Have you, a relative, or close friend ever

2     been the victim of a crime or ever testified in a criminal

3     case?  I don't see any hands.

4          Okay.  How about those television programs?  Raise

5     your hand if you've seen the programs like Prison Break, Oz,

6     Shawshank Redemption, any of those documentary types.  Looks

7     like almost everybody.  Would any of those things influence

8     you in any way or prevent you from making your decision just

9     based on the facts in this case?

10          I don't see any hands for that.

11          Okay.  How about movies about the criminal justice

12     system?  Anyone seen any of those and believe they would

13     impact your ability to be fair in this case?

14          I don't see any hands.

15          Does anyone have any feelings about the charges

16     against the defendant here that would make it difficult for

17     you to be a fair and impartial juror?

18          I don't see any hands.

19          And does everyone understand -- I should say is

20     there anyone who doesn't agree with our system that allows the

21     defendant not to testify?  Defendants have an absolute right

22     not to testify.  Anybody have any problem with that?

23          Okay.  Anybody have yes answers, if you remember

24     those questions Ms. Sanneman asked?

25          Do you have any yes answers to those?  How about the

1    questions Mr. Goldman asked if you remember those?  Anybody

2    have any particular thoughts on those?

3              Okay.  And picture yourself, again, seated at both

4    of those tables.  Even if I haven't asked a question to bring

5    it out, anyone feel for any reason that you have something

6    else you should tell us or that you can't be a fair and

7    impartial juror in this case?  I don't see any hands.

8              Ms. Sanneman, would you like a few minutes?  I'm

9    sorry.

10             Yes, Juror No. 14.

11             PROSPECTIVE JUROR KIM:  I'm very really little

12   English speaking.  There's no problem with the conversation or

13   the basic stuff, but some of them are very hard to

14   understanding, like the laws and stuff.  So it really bothers

15   me.

16             THE COURT:  Have you understood what we've been

17   talking about so far?

18             PROSPECTIVE JUROR KIM:  Some of them I really cannot

19   understand.

20             THE COURT:  Okay.  You said you're a teller at

21   CitiBank.

22             PROSPECTIVE JUROR KIM:  Yeah, I'm just regular

23   customer, those are fine.  But it's not like all the law and

24   stuff, it's -- it's hard to understand.  I don't understand

25   some of them.

1          THE COURT:  So you understand normal conversation.

2    You're just concerned, you want to make sure you're fair?

3          PROSPECTIVE JUROR KIM:  Because I was once in the

4    Torrance court, and somebody came for collecting the

5    marijuana, some kind of stuff, and I didn't quite understand.

6    So they both like guilty or not guilty stuff, I

7    misunderstanding.  So I don't really want -- I not agree with

8    that, and we do it again.  And then they explain to me like

9    one by one.  And I understand later on, so I agree with them.

10          THE COURT:  So you were on a jury.  Is that what

11   you're saying?

12          PROSPECTIVE JUROR KIM:  Yes.

13          THE COURT:  And then at first there were some things

14   you didn't understand?

15          PROSPECTIVE JUROR KIM:  Yes.

16          THE COURT:  Is that right?  And then the jurors

17   explained to you what their thoughts were on the case?

18          PROSPECTIVE JUROR KIM:  Yes.

19          THE COURT:  And then you understood?

20          PROSPECTIVE JUROR KIM:  Yes.

21          THE COURT:  Okay.  Thank you for that information.

22          Ms. Sanneman?

23          MS. SANNEMAN:  Your Honor, the government is

24   agreeable to the jury as constituted.

25          THE COURT:  Okay.  You want to ask any questions?

1          MS. SANNEMAN:  No, your Honor.

2          THE COURT:  Mr. Goldman, would you like to ask some

3  questions?

4          MR. GOLDMAN:  I wouldn't, your Honor, although I

5  would move that the Court excuse for cause Ms. Kim.  I think

6  that we have sufficient jurors, and I think it would be better

7  to err on the side of caution.

8          THE COURT:  Do you have any problem with that?

9          MS. SANNEMAN:  No.

10          MR. GOLDMAN:  We don't have any problem.

11          THE COURT:  All right.  Ms. Kim, thank you very

12  much.  You are excused to return to the jury room.

13          Ms. Sanneman, you want to pass?

14          MS. SANNEMAN:  Yes.

15          THE COURT:  That means the peremptory is with the

16  defense.  I'm sorry.  It wasn't Ms. Sanneman's turn anyway.  I

17  was really asking her if she wanted to ask some questions, and

18  we're to you anyway, Mr. Goldman.

19          MR. GOLDMAN:  Thank you.  We would thank and excuse

20  Juror No. 7 and Juror No. 9.

21          THE COURT:  Juror 7, thank you very much.  You are

22  ordered to return to the jury room.

23          Juror No. 13, please take seat No. 7.  You are now

24  Juror No. 7.  And Juror No. 9, you are excused.  Thank you

25  very much.  You are to return to the jury room.  And Juror

 1    No. 15, please take seat No. 9.  You are now Juror No. 9.

 2            And now the peremptory is with the government.

 3            MS. SANNEMAN:  Your Honor, I'm sorry.  May I have

 4    one moment?

 5            THE COURT:  Sure.

 6            MS. SANNEMAN:  Your Honor, the government passes.

 7            THE COURT:  The peremptory is with the defense.

 8            MR. GOLDMAN:  Your Honor, we thank and excuse Juror

 9    No. 11.

10            THE COURT:  Juror No. 11, thank you very much.  You

11    are excused.

12            You are ordered to return to the jury room.

13            Juror No. 6, please take seat number 11.  You are

14    now Juror No. 11.

15            Do you have another one, Mr. Goldman?

16            MR. GOLDMAN:  I do.  We would thank and excuse Juror

17    No. 2, your Honor.

18            THE COURT:  Juror No. 2, thank you very much.  You

19    are excused.  You are ordered to return to the jury room.

20            Juror No. 17, please take seat No. 2.  You are now

21    Juror No. 2.  And the peremptory is with the government.

22            MS. SANNEMAN:  Again, I request one moment, your

23    Honor.

24            THE COURT:  Sure.

25            MS. SANNEMAN:  We'll pass, your Honor.

```
 1            THE COURT:  The peremptory is with the defense.

 2            MR. GOLDMAN:  Thank you, your Honor.  Your Honor, I

 3   have a question for the Court.  Is the government allowed to

 4   come back after it passes?  I want to pass.

 5            THE COURT:  Then those will be our jurors.

 6            MR. GOLDMAN:  All right.  Your Honor, we would thank

 7   and excuse Juror No. 2.

 8            THE COURT:  Juror No. 2, thank you very much.  You

 9   are excused.  You are ordered to return to the jury room.

10   Juror No. 18, please take seat No. 2.  You are now Juror No.

11   2.

12            You have one more peremptory, Mr. Goldman.

13            MR. GOLDMAN:  If I may, your Honor.  Your Honor, we

14   thank and excuse Juror No. 1.

15            THE COURT:  Juror No. 1, thank you very much.  You

16   are excused.  You are ordered to return to the jury room.

17            Ms. Plato, would you fill seat No. 1 and 13 through

18   18.

19            THE CLERK:  Thank you, your Honor.

20            Juror No. 1 will be Tami Stoffel.

21            Juror No. 13, Dennis Dayne.

22            14, Jane Fielder.

23            15, Eric Dorado.

24            16, Tamara Goodrich.

25            17, Tippavan Tolbert.  And,
```

1        18, Nathan Carlson.

2        THE COURT:  All right.  Now that you all know where

3   you're seated, we'll take a lunch break.  When you return,

4   wait outside until we call you in.  Those of you in those 12

5   seats come back to those 12 seats.  Those of you in the front

6   row, come back to the front row.  The rest of you, you need to

7   come back, but you can sit anywhere in the audience when you

8   return.

9        So for the moment, don't talk about the case.  Don't

10  form or express any opinions about the case.  Don't even talk

11  to each other about the case unless you want to comment on,

12  you know, how smart the judge is or something like that.  That

13  would be okay.  But other than that, no talking about the

14  case.  You are ordered to return at 1:30, and you are ordered

15  to have a good lunch.

16        **(WHEREUPON THE PROSPECTIVE JURY PANEL WITHDRAWS.)**

17        THE COURT:  All right.  While Ms. Plato is finding

18  out what our juror wanted to talk to me about, you can have a

19  seat.  I assume the government will be ready to go shortly

20  after we return from lunch?

21        MS. SANNEMAN:  I'm sorry, your Honor?

22        THE COURT:  Will you be ready to start your case?

23        MS. SANNEMAN:  After lunch, yes.

24        THE COURT:  All right.  The juror in seat No. 5,

25  Tony Massihi, apparently has been advised that he only gets

1    paid for one day of jury service.

2              MR. GOLDMAN:  Isn't that illegal?

3              THE COURT:  No, sadly.  He's in tech support with

4    the Platinum Group.  And they do that specifically because

5    they think it gets their employees off jury duty.  So I would

6    not be inclined to excuse him for that.  It's going to be a

7    very short trial.  He's single.  So he apparently doesn't have

8    dependents.

9              The only one with peremptories left is Ms. Sanneman.

10   So I guess we'll leave it to her as to whether she wants him

11   to serve or not.  I can ask him whether it would be a severe

12   hardship, but if he can use vacation or anything else for it,

13   I wouldn't let him go.  So I'll let you think about that over

14   the lunch hour.

15              (Lunch recess taken at 12:00 P.M.)

16

17

18

19

20

21

22

23

24

25        __Los Angeles, California; Tuesday, November 17, 2009__

1                          **1:30 P.M.**

2        **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY PANEL.)**

3              THE COURT:  Mr. Goldman?

4              MR. GOLDMAN:  Your Honor, I wanted to speak to the

5    Court with respect to the prosecution's use of peremptory

6    challenges.  As I understand it, or what has happened, is that

7    the prosecution has passed when the Court has asked them if

8    they choose to exercise their peremptory challenges.  And --

9    but they have the opportunity later on to exercise those

10   peremptory challenges after I go.

11             My concern, your Honor, and this has to do with

12   fairness, is that I don't think it's appropriate that the

13   prosecution be allowed to back --

14             THE COURT:  You have ten peremptories.  They have

15   six.  It has always been my policy in my 12 1/2 years on the

16   bench not to require the party to give up the peremptory

17   simply because they passed.  Now, if they pass and then you

18   pass, then you are both done because you both accepted that

19   jury.  It's usually the government that's complaining that I'm

20   letting the defense go back because they are so disadvantaged

21   by having four fewer peremptories.  But that's always the way

22   I've done it, and it's proper under the law.

23             MR. GOLDMAN:  I mean, that's not my concern.  My

24   concern is that I don't think it's fair to allow them to go

25   back and use peremptories against jurors who they have already

1  accepted.  I have no objection to them exercising peremptories

2  with jurors, with new jurors who are in the box, but if they

3  have accepted jurors, I think it's unfair for them to have the

4  ability to go back and strike those jurors.

5          THE COURT:  Well, again, I don't have a problem with

6  that.  I've always allowed them to, and I was never a trial

7  lawyer.  I tried a couple trials in my life as a lawyer, but

8  people who do this seem to feel that there's a dynamic to the

9  12.  So if now a new juror that they are willing to keep

10  because they like better than someone else because they think

11  doesn't have a good dynamic with someone else, that that's

12  they are looking at, and they can go back and strike someone

13  that they have already accepted.

14          MR. GOLDMAN:  I wanted to broach that issue with the

15  Court, and to note my objection with respect to the use of

16  back striking.

17          THE COURT:  All right.

18          MR. GOLDMAN:  Thank you, your Honor.

19          THE CLERK:  Your Honor, I'm missing one juror.  I'm

20  going to go back out and check, but he's -- and she's in the

21  box.

22          THE COURT:  Maybe we should bring Juror No. 5 in and

23  see what his problem is.

24          THE CLERK:  Okay.

25          THE COURT:  Step forward, sir.  Please take your

1    seat.  You indicated to Ms. Plato that you found out you only

2    get paid for one day of jury service?

3              PROSPECTIVE JUROR MASSIHI:  Right.

4              THE COURT:  When did you find that out?

5              PROSPECTIVE JUROR MASSIHI:  During the break.

6              THE COURT:  So that was when you decided to call?

7              PROSPECTIVE JUROR MASSIHI:  Uh-huh.

8              THE COURT:  Why is that?

9              PROSPECTIVE JUROR MASSIHI:  What do you mean?  I

10   mean --

11             THE COURT:  Well, you knew you were coming down here

12   for jury duty.  This is the shortest trial possible, and all

13   of a sudden you decided to call and see?

14             PROSPECTIVE JUROR MASSIHI:  I mean, this was

15   explained to me like a month ago, or two month ago, and I got

16   it postponed.  So, you know, I didn't necessarily check with

17   HR, but, you know, I just -- I was trying to look for the

18   employee handbook that was given, and I couldn't find it.  So,

19   you know, last night I tried to get a hold of someone after I

20   found out that I have to come in, you know.  And I couldn't

21   get a hold of anyone after 7:00 at work.  So this was the only

22   time.

23             THE COURT:  How many people do you support?

24             PROSPECTIVE JUROR MASSIHI:  Do we support?  Around

25   200.

```
 1              THE COURT:  No, no, no.

 2              PROSPECTIVE JUROR MASSIHI:  What do you mean?

 3              THE COURT:  You live alone.  You said you're single.

 4              PROSPECTIVE JUROR MASSIHI:  Yes.

 5              THE COURT:  You support yourself?

 6              PROSPECTIVE JUROR MASSIHI:  Yes.

 7              THE COURT:  How much money do you make?

 8              PROSPECTIVE JUROR MASSIHI:  Well, I live with my

 9      parents.  So I am single.  I live with my parents.  And I

10      don't really -- that's it.  Just -- but I still, you know,

11      need money to help pay for the bills.

12              THE COURT:  How much money do you make?

13              PROSPECTIVE JUROR MASSIHI:  Almost 2,000 a month.

14              THE COURT:  Okay.

15          Ms. Plato, how we doing?

16              THE CLERK:  Good, your Honor.  I think we're ready

17      to go.

18              THE COURT:  Good.  Why don't you bring in the rest

19      of the jurors.

20              (WHEREUPON THE PROSPECTIVE JURY PANEL ENTERS.)

21              THE COURT:  All right.  You may be seated.  Let's

22      start with our new juror, No. 1.

23              PROSPECTIVE JUROR STOFFEL:  Tami Stoffel, Santa

24      Clarita, Bachelor's.  My employer, Ahedmon Partners

25      (phonetic).  I'm a CPA.  I'm married.  My -- I have two
```

1   children in college.  I have never had prior jury service.

2              THE COURT:  Thank you.  What does your husband do?

3              PROSPECTIVE JUROR STOFFEL:  He's a sales manager.

4              THE COURT:  New Juror No. 13.

5              PROSPECTIVE JUROR DAYNE:  I'm from the eastern

6   San Gabriel Valley.  I have a Bachelor of Science in

7   electronics engineering.  My employer is Southern California

8   Edison Company.  My occupation is -- I originate, modify, and

9   administer bulk power, purchase sale and exchange agreements.

10  I'm married.  I have two adult children.  One is a firefighter

11  who works for Santa Fe Springs Fire Department.  The other is

12  a school teacher that works in Las Vegas, Nevada.

13             I have two -- I have prior jury service, two

14  criminal cases, a DUI case.  A verdict was reached, and an

15  abuse case, a verdict was not reached.

16             THE COURT:  Does your wife work outside the home?

17             PROSPECTIVE JUROR DAYNE:  Yes, she does.  My wife is

18  a speech and language pathologist.

19             THE COURT:  Thank you.  Juror No. 14.

20             PROSPECTIVE JUROR FIELDER:  I live in Ventura.  I

21  have a Bachelor's in science, biological sciences.  I work for

22  Herzog Wine as a lab assistant.  I'm single.  My father is a

23  senior property manager, and my mom is a teacher.  I have

24  never been on a jury before.

25             THE COURT:  Thank you.

1          Juror No. 15.

2          PROSPECTIVE JUROR DORADO:  Eric Dorado.  Lake

3   Balboa, Van Nuys.  Van Nuys.  Associate's degree.  Another

4   year of college.  I work for private insurance for Workers'

5   Comp Insurance Company.  I work in the special investigations

6   unit.  Separated.  I have two young children.

7          I've never been on any civil or criminal case.

8          THE COURT:  Thank you.  What did your wife do when

9   you were together?

10         PROSPECTIVE JUROR DORADO:  She worked in the same

11  company.  She just provided relations.  They designate all the

12  doctors and hospitals for the injured workers.

13         THE COURT:  Okay.  Tell me what kind of

14  investigative work you do.

15         PROSPECTIVE JUROR DORADO:  I work on the fraud

16  aspect.  I am basically in charge of the State of California

17  for the vendor panel for all investigations, whether it's

18  surveillance along with subrogation cases.  I -- I distribute

19  the work throughout the state and also receive the reports for

20  the investigations.  I review them before our private

21  investigators receive them.

22         THE COURT:  Okay.  So during the course of your

23  career, have you been in situations where you've interviewed

24  with witnesses yourself?

25         PROSPECTIVE JUROR DORADO:  I have taken statements

1    in the past over the phone.  Mainly Spanish-speaking.

2            THE COURT:  Okay.  And how do you go about

3    documenting those statements?  Are they handwritten?  Do you

4    type them while you're talking to the person?

5            PROSPECTIVE JUROR DORADO:  We record them, and

6    sometimes we send them out to transcription.  I do take

7    handwritten notes, and then I type them up into our database.

8            THE COURT:  Thank you.

9            Juror No. 16.

10           PROSPECTIVE JUROR GOODRICH:  My name is Tamara

11   Goodrich.  I am from Burbank.  I have a visual communications

12   degree, Bachelor's degree.  I'm a self-employed writer and

13   actor.  I am single.  My roommate is a director/writer/editor.

14   And I have no prior jury experience.

15           THE COURT:  Thank you.

16           Juror No. 17.

17           PROSPECTIVE JUROR TOLBERT:  My name is Tippavan

18   Tolbert.  I live in Santa Clarita.  I have a high school

19   diploma as well as a current California real estate

20   salesperson license.  I am a loan underwriter, currently

21   employed with Prospect Mortgage as a quality assurance

22   associate.  I'm married.  My husband is a trademark processing

23   specialist.  I have one adult child living with me.  He goes

24   to community college.  I have prior criminal jury service,

25   which there was a verdict, and no Grand Jury.

```
 1            THE COURT:  Do you remember what that criminal case

 2   was about?

 3            PROSPECTIVE JUROR TOLBERT:  I think it was a drug

 4   possession.

 5            THE COURT:  Okay.

 6            Juror No. 18.

 7            PROSPECTIVE JUROR CARLSON:  My name is Nathan

 8   Carlson.  I live in South Pasadena.  I have a Bachelor of

 9   Science.  My employer is Training Systems Design, and they do

10   custom corporate training.  I'm an instructional designer.  I

11   am single.  No adults living with me.  And no prior jury

12   service.

13            THE COURT:  Thank you.

14            Again, take a look at those first nine questions,

15   the general questions, and let me know if your answers would

16   be any different from what we've heard.  If you have any yes

17   answers to those, raise your hand.

18            Juror No. 14.

19            PROSPECTIVE JUROR FIELDER:  With regard to question

20   No. 6.  My uncle used to live in Nigeria.  He worked -- was

21   part of the Peace Corps, and he lived there for a time.  He

22   told me quite a bit about his experiences there.  They were

23   all positive.

24            THE COURT:  What kinds of stuff did he do?

25            PROSPECTIVE JUROR CARLSON:  He helped build schools
```

```
 1    there, and he helped tutor the local school children there.

 2              THE COURT:  Great.  Okay.  Thank you.

 3              Anybody else?

 4              Juror No. 16.

 5              PROSPECTIVE JUROR GOODRICH:  I have a -- my cousin

 6    is married to a maximum security officer.  Corrections

 7    officer.

 8              THE COURT:  Do you talk to that person very much?

 9              PROSPECTIVE JUROR GOODRICH:  No.

10              THE COURT:  Okay.  Anything about that that makes

11    you think you wouldn't be fair in this case?

12              PROSPECTIVE JUROR GOODRICH:  No.

13              THE COURT:  Okay.  Great.

14              Let's look at question No. 10 that talks about

15    friends, relatives, or you yourself with law enforcement,

16    training with the courts, correctional facilities, that kind

17    of thing of our new jurors and more information.

18              Juror No. 1.

19              PROSPECTIVE JUROR STOFFEL:  I have a few neighbors

20    that are law enforcement.  One is in the special services.

21    The other is a sheriff locally.

22              THE COURT:  Anything about those things that makes

23    you think you couldn't be fair?

24              PROSPECTIVE JUROR STOFFEL:  No.

25              THE COURT:  Okay.
```

1          Anybody else out here?

2          Number 13.

3          PROSPECTIVE JUROR DAYNE:  My brother is a retired

4     lieutenant from the Galleon Police Department in Ohio.  And I

5     have a neighbor who is currently an L.A. County Sheriff's

6     Department deputy sheriff.

7          THE COURT:  All right.  Anything about those

8     connections that makes you think you couldn't be fair here?

9          PROSPECTIVE JUROR DAYNE:  No.

10         THE COURT:  Okay.  Anything else?

11         Juror No. 14.

12         PROSPECTIVE JUROR FIELDER:  I have several neighbors

13    that work for the Ventura Police Department as sworn officers.

14    I have several cousins who are police officers in the Altoona,

15    Pennsylvania, police department, and I have a cousin who works

16    for the FBI.

17         THE COURT:  Anything about those things that makes

18    you think you couldn't be fair?

19         PROSPECTIVE JUROR FIELDER:  No.

20         THE COURT:  All right.

21         Yes, Juror No. 15.

22         PROSPECTIVE JUROR DORADO:  My current supervisor is

23    a retired sheriff.  I also have three childhood friends that

24    are L.A.P.D. officers.  Another good friend of mine is a

25    current detective for the Starr Center, Whittier sheriffs.

1          THE COURT:  Okay.  Anything about those contacts

2   that makes you think you couldn't be fair in this case?

3          PROSPECTIVE JUROR DORADO:  No.

4          THE COURT:  Anybody else?

5          Okay.  Anyone here, yourself, or a relative or close

6   friend been employed by the federal government?

7          Anybody know employees of the Federal Bureau of

8   Prisons or FBI agents that might prevent you from measuring

9   their testimony the same way you judge the testimony of other

10  witnesses?

11         Anybody have any experience with law enforcement

12  officers where the officer was not truthful?

13         Would the fact that a witness is a law enforcement

14  officer make you more likely or less likely to believe his or

15  her testimony?  Anybody feel either way about that?

16         Okay.  Anybody have any difficulty or embarrassment

17  returning a verdict for or against the government because the

18  government has law enforcement officers as witnesses?

19         Okay.  Have you, a relative, or close friend ever

20  been accused of, charged with, or convicted of a crime?

21         Juror No. 14.

22         PROSPECTIVE JUROR FIELDER:  I have a cousin who was

23  convicted of selling marijuana to an undercover agent, and he

24  was put in jail for about a month.

25         THE COURT:  Okay.  Anything about that that makes

1    you think you couldn't be fair here?

2          PROSPECTIVE JUROR FIELDER:  No.  And I do have

3    another cousin who was charged with -- it had something to do

4    with -- it was a federal crime, and he was put in jail.  He

5    was eventually found not guilty.

6          THE COURT:  Okay.  Anything about that that makes

7    you think you couldn't be fair here?

8          PROSPECTIVE JUROR FIELDER:  No.

9          THE COURT:  Juror 18?

10          PROSPECTIVE JUROR CARLSON:  My sister was convicted

11    of a DUI, but it shouldn't affect my judgment.

12          THE COURT:  Thank you.  Anybody else?

13          Okay.  Have you, a relative, or close friend ever

14    been an inmate in a prison, jail, or correctional facility or

15    ever visited one of those facilities for any reason?

16          Do you believe you, a relative, or a close friend

17    has ever been treated badly by the government, law

18    enforcement, or the courts?

19          Have you, a relative, or a close friend ever been

20    the victim of a crime or testified in a criminal case?

21          Juror No. 1.

22          PROSPECTIVE JUROR STOFFEL:  My in-laws had their

23    house broken into.  They have had two cars broken into.  My

24    car was stolen once.  And then I had a cousin that was

25    murdered.

1          THE COURT:  Were the people for those things caught?

2          PROSPECTIVE JUROR STOFFEL:  Only in the murder.

3          THE COURT:  Pardon?  In the murder?

4          PROSPECTIVE JUROR STOFFEL:  Yes.

5          THE COURT:  Was there a trial in that case?

6          PROSPECTIVE JUROR STOFFEL:  Yes.

7          THE COURT:  Do you know what happened with it?

8          PROSPECTIVE JUROR STOFFEL:  Yes.

9          THE COURT:  Was there a conviction?

10         PROSPECTIVE JUROR STOFFEL:  Yes, but I was not

11   pleased with the sentence.

12         THE COURT:  Okay.  And do you think that would

13   affect your ability to judge this case in any way?

14         PROSPECTIVE JUROR STOFFEL:  I don't think so.

15         THE COURT:  Okay.  The juries don't decide

16   sentences.  So that will not eventually be up to you if it

17   comes to that.  And that's true in all criminal cases.

18         And a couple more hands out there.  Juror No. 14.

19         PROSPECTIVE JUROR FIELDER:  When I was a young

20   child, someone exposed themselves to me and my cousins, and my

21   mom testified against him.

22         THE COURT:  What happened in that case?  Do you

23   know?

24         PROSPECTIVE JUROR FIELDER:  He was found guilty and

25   is in prison.

1          THE COURT:  Juror No. 15.

2          PROSPECTIVE JUROR DORADO:  My ex-wife, when we were

3   dating, was attacked and beaten.

4          THE COURT:  And was that person caught?

5          PROSPECTIVE JUROR DORADO:  No.

6          THE COURT:  Do you think that would affect your

7   ability to be fair here in any way?

8          PROSPECTIVE JUROR DORADO:  No.

9          THE COURT:  Okay.  And who else?

10          Number 16.

11          PROSPECTIVE JUROR GOODRICH:  My car was broken into.

12          THE COURT:  Anybody caught?

13          PROSPECTIVE JUROR GOODRICH:  No, but a lot of the

14   stuff was returned to the neighbor's doorstep.

15          THE COURT:  Okay.  Juror No. 17?

16          PROSPECTIVE JUROR TOLBERT:  My car was stolen.

17          THE COURT:  Anybody caught?

18          PROSPECTIVE JUROR TOLBERT:  Not that I know of.

19          THE COURT:  Okay.  How about Juror No. 18?

20          PROSPECTIVE JUROR CARLSON:  My car was broken into a

21   couple of times, and my identity was stolen a couple of times.

22          THE COURT:  Okay.  Tell me about the identity theft.

23   How long ago was that?

24          PROSPECTIVE JUROR CARLSON:  It was probably four or

25   five years ago.  Nobody was ever -- they didn't follow up with

1    me.  So I don't know if anybody was caught.

2           THE COURT:  Has that caused you any problems other

3    than sort of that one incident?

4           PROSPECTIVE JUROR CARLSON:  Inconvenience.  It

5    worked itself out.

6           THE COURT:  Okay.  And if I didn't ask anybody, is

7    there any of those things that you've told me, would that

8    affect your ability to be fair?  I don't see any hands.

9           How about those television programs, movies, and

10   that kind of thing.  Is there anybody who has seen that kind

11   of thing that would influence you in any way or prevent you

12   from making a decision just based on the facts in this case?

13          Juror No. 7?

14          PROSPECTIVE JUROR CHIN:  I didn't mention this

15   before.  My car had been broken into a couple of times.

16   Nobody was caught.  And it wouldn't affect my judgment.

17          THE COURT:  Okay.  Thank you.  Just raise your hand,

18   though, if you watch Prison Break, Oz, or you've seen

19   Shawshank so we know.

20          Anybody watched any documentaries about prisons or

21   the correctional system?

22          Okay.  Great.  And has anyone seen any movies or

23   programs about the criminal justice system in general that

24   would influence you in making your decision in this case?

25          Thank you.  Does anyone have any feelings about the

1    particular charges against this defendant that would make it

2    difficult for you to be a fair and impartial juror in this

3    case?  Great.  And does everyone agree with the principle in

4    our Constitution that states that a defendant has an absolute

5    right not to testify?  Anybody have a problem with that?

6           Okay.  And Ms. Sanneman asked some questions before

7    lunch.  Anybody have any different answers from what we've

8    heard that you think Ms. Sanneman would want to know?  And how

9    about the questions Mr. Goldman asked?  Anybody have any

10   different answers to those?

11          Again, take a moment.  Picture yourself at one of

12   these tables.  And is there anything else about yourself that

13   you think we would want to know in order to pick a fair and

14   impartial jury, even if I haven't thought of a question to

15   bring it out?

16          Any reason at all you can't be fair?

17          Ms. Sanneman, would you like a couple of minutes?

18          MS. SANNEMAN:  Yes, please, your Honor.

19          THE COURT:  Sure.

20          MS. SANNEMAN:  Your Honor, just for clarification,

21   the alternates, will we be addressing those separately?

22          THE COURT:  Pass for cause?

23          MS. SANNEMAN:  Yes.

24          MR. GOLDMAN:  Yes, your Honor.

25          THE COURT:  All right.  And did you want to question

1    the jurors at all?

2            MS. SANNEMAN:  No, thank you, your Honor.

3            THE COURT:  Mr. Goldman?

4            MR. GOLDMAN:  No, your Honor.

5            THE COURT:  Thank you.  Now the peremptory is with

6    the government.

7            MS. SANNEMAN:  The government accepts the jury as

8    constituted.

9            THE COURT:  All right.  Ladies and gentlemen, the 12

10   of you in the box, would you please stand and raise your right

11   hands.

12           THE CLERK:  Do you and each of you solemnly swear or

13   affirm that you will well and truly try the cause now before

14   the court, that a true verdict therein render according to the

15   evidence and the instructions of this Court, so help you God?

16           THE JURY:  Yes.

17           THE COURT:  Now we're going to select two alternate

18   jurors.  I think that's a good number.  And that means each

19   side will have one peremptory.  The peremptory is with the

20   government as to Juror Nos. 13 and 14.

21           MS. SANNEMAN:  Your Honor, the government would like

22   to thank and dismiss Juror No. 14.

23           THE COURT:  Juror No. 14, thank you very much.  You

24   are excused.  You are ordered to return to the jury room.

25           And the peremptory with Mr. Goldman as to 13 and 15.

1          MR. GOLDMAN:  Your Honor, we would -- it's one

2    peremptory, your Honor?

3          THE COURT:  Correct.

4          MR. GOLDMAN:  It's one alternate?

5          THE COURT:  Two alternates, one peremptory.

6          MR. GOLDMAN:  Your Honor, we'd thank and excuse

7    Juror No. 15.

8          THE COURT:  Juror No. 15, thank you very much.  You

9    are excused.  You are ordered to return to the jury room.

10          Juror No. 13, would you take the seat up in the jury

11    box here, please.  And Juror No. 16, please take the next seat

12    up here in the jury box.

13          Actually, you can just stand right by those seats

14    and raise your right hands.

15          THE CLERK:  Please raise your right hand.

16          (Alternates sworn.)

17          THE CLERK:  Thank you.

18          THE COURT:  Thank you.  Any reason why the remaining

19    jurors should not be excused in order to return to the jury

20    room?

21          MR. GOLDMAN:  No, your Honor.

22          MS. SANNEMAN:  No, your Honor.

23          THE COURT:  All right, ladies and gentlemen.  Thank

24    you for being here with us.  I know sometimes it's really

25    exciting to get to go back.  Sometimes it's disappointing to

1    get to go back.  Sorry we didn't talk to all of you, but we

2    did need all of you to be here, as you can see, just in case

3    we needed to use more of you.  And you are ordered to return

4    to the jury room at Spring Street.  Thank you very much for

5    being with us.

6              All right.  Thank you.  Sit back and relax, and I'm

7    going to chat with you for a few minutes.

8              You've been selected and sworn as the jurors and

9    alternates in this case.  And I'm going to take a few minutes

10   to tell you about your basic duties and conduct.  At the end

11   of the trial, I'll give you more detailed instructions.  All

12   of the Court's instructions, whether given before, during, or

13   after the taking of testimony are of equal importance.  You

14   must base the decisions you make on the facts and the law.

15             First, you must determine the facts from the

16   evidence received in the trial and not from any other source.

17   Evidence is the sworn testimony of witnesses, the exhibits

18   that are admitted into evidence, and any stipulations by the

19   parties.  A stipulation is an agreement about the facts.  If

20   the parties do stipulate to a fact in this case, I'll let you

21   know specifically what that is.

22             Second, you must apply the law, as I state it to

23   you, to the facts as you determine them and in this way,

24   arrive at your verdict and any questions you are instructed to

25   answer.

1          In evaluating the testimony of witnesses, consider

2    the following questions:  How well could the witness see or

3    hear or otherwise sense the things about which the witness

4    testified.  How well was the witness able to remember and

5    describe what happened.  How was the witness's behavior while

6    testifying.  Did the witness understand the questions and

7    answer them directly.  Did the witness have a reason to lie

8    such as bias or prejudice or a personal interest in how the

9    case is decided.  What was the witness's attitude about the

10   case or about testifying.

11         How reasonable is the testimony when you consider

12   all the other evidence in the case.  Did other evidence in the

13   case prove or disprove any fact about which the witness

14   testified.  Use your common sense and good judgment to

15   evaluate the testimony based on the circumstances.  There are

16   two kinds of evidence, direct and circumstantial.

17         Direct evidence is direct proof of a fact such as

18   testimony of a witness about what that witness saw or heard or

19   did.  Circumstantial evidence is proof of one or more facts

20   from which you could conclude that other facts exist.  You

21   should consider both kinds of evidence.  The law makes no

22   distinction between the weight to be given to either direct or

23   circumstantial evidence.

24         It is for you to decide how much weight to give to

25   any evidence.  Please understand that no statement, ruling,

1    remark, or comment that I may make during the course of the
2    trial is intended to indicate my opinions as to how the jury
3    should decide the case or to influence the jury in any way in
4    its determination of the facts.
5         At times I may find it necessary to direct one or
6    both of the attorneys to do or not to do certain things.  I
7    may even find it necessary to make some criticism of an
8    attorney's conduct.  If I do so, you must not show prejudice
9    toward the attorney or the side the attorney represents simply
10   because I have found it necessary to say something to the
11   attorney.
12        Statements or arguments by attorneys are not
13   evidence.  You must accept and follow the law as I state it to
14   you, whether or not you agree with the law.
15        If anything concerning the law said by the attorneys
16   in their arguments or at any other time during the trial
17   conflicts with my instructions on the law, you must follow my
18   instructions.
19        Questions are not evidence.  Do not assume to be
20   true any insinuation suggested by a question asked a witness.
21   The question may be considered only as it helps you to
22   understand the answer.  If a question is objected to and the
23   objection is sustained, which means the witness may not
24   respond, you must not guess about what the answer might have
25   been or the reason for the objection.

1          Of course, if the objection is overruled and the

2     witness is allowed to answer, you may consider that answer as

3     you would any other evidence in the case.  Please remember

4     that it's an attorney's duty to object to questions that the

5     attorney believes are not proper.  And you should not show

6     prejudice toward the attorney or the side the attorney

7     represents because the attorney makes an objection.

8          Sometimes I may order that evidence be stricken and

9     tell you to disregard or ignore the evidence, and that means

10    that when you are deciding the case, you must not consider

11    that evidence for any purpose.  Treat it as though you had

12    never heard of it.

13         Some evidence might be admitted only for a limited

14    purpose.  If I tell you that certain evidence has been

15    admitted for a limited purpose, you may consider it for that

16    purpose only and not for any other purpose.

17         You must not independently investigate the facts or

18    the law or consider or discuss facts as to which there is no

19    evidence.  And this means, for example, that you may not visit

20    or view any place that you hear described in the case.  You

21    can't conduct experiments.  You can't consult the Internet.

22    You can't look at any reference works.  You can't talk to

23    anybody and ask for additional information.  Even if you don't

24    tell people that you're on a jury or that it has something to

25    do with the case.  You cannot even look up a word in the

1    dictionary if you don't know or don't all agree on the meaning

2    of a word.

3         You can't consider anything as evidence that you

4    might see or hear when court is not in session, even if what

5    you see or hear is done or said by one of the parties or one

6    of the witnesses.

7         Now, this is really important.  No matter how many

8    times I say it, sometimes jurors just either don't pay

9    attention or just ignore my instructions.  But these are not

10   just polite requests.  They are court orders.  They have the

11   same effect as law.  You can't get on the Internet.  You can't

12   look in Facebook.  You can't post anything on your MySpace

13   page.  You can't twitter or tweet or whatever else it's

14   called.  You just can't do that stuff.

15        And I know there's some of you out there that have

16   particular technical skills.  You can't use them until after

17   this case is over.  For those of you without all those amazing

18   technical skills, you can't read any news stories or articles

19   or listen to any radio or television reports about the case if

20   there happen to be any or if there is anything that has

21   anything to do with it.

22        You will be given notebooks and pencils.  Leave them

23   on your seat each day and at each recess.  You will be able to

24   take them into the jury room when you deliberate.  You can

25   take notes, but don't let note taking distract you from

1    listening to other testimony.  Remember, you are the judges of

2    the believability of the witnesses.  Notes are just an aid to

3    your memory, and they shouldn't take the place of your memory.

4         A juror who doesn't take notes should rely on his or

5    her own recollection of the evidence and not be influenced by

6    the fact that other jurors do take notes.

7         By the way, you may see me taking notes during the

8    trial.  But I take notes for completely different reasons.  So

9    when you see me writing something down, it doesn't necessarily

10   mean that you should write it down.

11        You can ask for testimony to be read back if you

12   really need that.  But it's really better if you pay

13   attention, and sometimes jurors sort of take a while to ease

14   into the process of focusing in on the trial.

15        So my experience has been that jurors ask for

16   readback more in shorter trials than they do in longer ones.

17   So I'm going to ask you to start paying attention right away

18   because we're going to start in just a couple of minutes, and

19   it really takes quite a while for us to get all of the

20   testimony together if you ask for a readback.

21        Mr. Schweitzer, I am informed, actually has a life

22   and does not go home every night and prepare this into a nice

23   transcript that could be given to you.  So if you do need

24   testimony read back, he'd have to prepare and take out any

25   objections or any sidebar conversations or anything you didn't

1    hear in court, and that takes a while.

2              Now, of course, if you really need that, we'll take

3    care of that for you.

4              You will be permitted to separate at recesses.  You

5    must return following the recesses at such times as I instruct

6    you.  During recesses, you must not discuss with anyone any

7    subject connected with this trial, not anyone at home, not

8    anyone at work, and not even among yourselves.  If you're

9    sitting together back in the jury room or you're going out for

10   a break or out on the way to the bus or your car after our

11   session is over, you must speak only of matters entirely

12   unrelated to the trial.

13             And as I said, that means you can't write anything

14   about the case either, not on a website or a blog or any kind

15   of posting stuff that they have out there.

16             You are also ordered not to have any conversation at

17   all with the attorneys or the parties or any witnesses called

18   in the proceeding.  And that means if you see them in the hall

19   or anywhere else, don't even greet them.  Don't ask them how

20   much longer the trial will last.  Don't ask them for a good

21   place to eat or anything else.  You probably won't know who

22   the witnesses are.  So don't talk.  Always wear your juror

23   badges.  And if you're in the hall or the restroom and you

24   hear somebody talking about the case, please ask them not to

25   talk about it in your presence or simply turn around and

 1   leave.

 2          These people won't be offended if you don't talk to

 3   them because they know you're not allowed to.  Don't be

 4   offended if they don't talk to you because they are not

 5   allowed to talk to you either.  If anybody does try to talk

 6   to you about the case, please tell them that you won't speak

 7   to them, and immediately inform Ms. Plato of this conduct.

 8          Don't be concerned if you see a witness talking to

 9   each other or to the attorneys.  That is permissible.  As I

10   said, please just stay far enough away from them that you

11   don't overhear their conversation.

12          During the course of the trial and before you begin

13   your deliberations, you must keep on open mind on the case and

14   on all the issues you'll be asked to decide.  In other words,

15   as I will say or hope to say at every break, you must not form

16   or express any opinion on the case until it's finally

17   submitted to you.  And if you do need to communicate with me

18   at any time, you need to give a signed note to Ms. Plato or

19   the bailiff when we have one.

20          And by the way, as you might know, all of our

21   courtrooms are public courtrooms.  People sometimes like to

22   come and watch trials.  And that's perfectly all right.  Don't

23   let it distract you if people come in and out.  My law clerks

24   and my externs sometimes come and watch portions of the trial.

25   Please be sure that no one you know, no friend or relative is

1   here unless I know about it.  As I said, it's a public

2   courtroom, but we want to make sure that you don't hear

3   anything that happens while you're not in the courtroom.

4            As for our alternate jurors, you are bound by all of

5   these admonitions.  Don't talk to each other or anyone else

6   about the case, and don't form or express any opinion on it

7   until the case is submitted to you, which means at such time

8   as you may be substituted in for one of our 12 jurors.

9            The next phase of the trial is ready to go.  First,

10  each side will be able to make an opening statement.  Then the

11  government may present its evidence, and the defense may

12  cross-examine the witnesses called by the government.  The

13  defendant may present evidence, and the government may

14  cross-examine the defense witnesses.  Witnesses don't

15  necessarily testify about things in the order in which they

16  happened.  Sometimes I allow witnesses to testify out of what

17  might seem like a sensible order to you to accommodate their

18  schedules.

19           So again, just be sure to keep an open mind until

20  you've heard all of the evidence.  After the evidence has been

21  presented, I'll instruct you on the law that applies to the

22  case, and then the attorneys will make their closing

23  arguments, and then you'll begin your deliberations.

24           So as I said, at this time the lawyers can make an

25  opening statement if they choose to do so.  Neither side is

1    required to make an opening statement.  An opening statement

2    is not evidence.  It's also not argument.  The attorneys are

3    not permitted to argue the case at this point in the

4    proceedings.  It's really an outline by counsel of what he or

5    she expects the evidence will show in this trial, and its

6    purpose is to assist you in understanding the case as it's

7    presented to you.

8           Ms. Sanneman, would you like to make an opening

9    statement?

10          MS. SANNEMAN:  Yes, your Honor.

11          **OPENING STATEMENT BY COUNSEL FOR THE GOVERNMENT**

12          MS. SANNEMAN:  On the morning of April 14th, 2007,

13   defendant Daniel Osazuwa violently attacked Oscar Medina.  At

14   that time the defendant was an inmate at the Metropolitan

15   Detention Center in Los Angeles, just down the street from

16   here.  And Oscar Medina was the prison guard who was assigned

17   to guard defendant's unit that day.  For his crime, defendant

18   has been charged with forcibly assaulting a federal officer

19   and consequently causing that federal officer bodily injury.

20          Now, let me take you back to the morning of April

21   14, 2007, and the events that led up to the defendant's

22   involvement.

23          Officer Medina was not typically assigned to guard

24   the defendant's unit.  He was filling in for another prison

25   guard that morning.  And defendant's unit, by the way, you're

1   going to hear, is referred to as 5 North.  That simply means

2   that defendant's cell was with other cells on the fifth floor

3   of the Metropolitan Detention Center on the north side, 5

4   North.

5           So the first time that Officer Medina even noticed

6   the defendant was when he saw interaction between the

7   defendant and another inmate, where it looked like the

8   defendant had angered the other inmate.

9           Now, Officer Medina noted this in his daily logbook

10  because prison guards are concerned about tensions between

11  inmates because they can lead to other problems, like fights

12  or other security issues.

13          Officer Medina noticed the defendant two more times

14  that morning.  The first time was when he noticed that the

15  defendant wasn't wearing the proper color clothing for inmates

16  who reside in 5 North.  Those inmates are supposed to wear

17  khaki-colored clothing or brown-colored clothing, and the

18  defendant was wearing green.

19          So Officer Medina -- this was of consequence to

20  Officer Medina because prison guards -- the color of an

21  inmate's clothes is to signify to prison guards where they are

22  housed or what type of privileges they have.

23          So Officer Medina told the defendant to change his

24  clothes.

25          Now, the second time that Officer Medina noticed the

1  defendant was at about 9:30 that morning when he saw the

2  defendant still hadn't changed his clothes.  So he approached

3  the defendant, and he ordered him to change his clothes.  This

4  time the defendant walked away from Officer Medina, and as he

5  was walking away, he picked up a loaf of bread in the food

6  service common area of the unit that was typically shared by

7  all the inmates, and he kept on walking.

8          This concerned Officer Medina because when an inmate

9  takes food that is supposed to be shared by all inmates, this

10  can create a problem in the prison as well, with fighting and

11  security issues.

12          So Officer Medina told the defendant to put the

13  bread back.  The defendant stopped.  He looked at Officer

14  Medina in the face.  He threw the bread down, and he yelled

15  "Fuck you."  And he walked off to his cell.

16          Officer Medina was surprised by this, and so he

17  called his supervisor, which was the activities lieutenant.

18  He told the activities lieutenant what had happened.  The

19  lieutenant told Officer Medina to secure or lock the

20  defendant's cell door, and he told Officer Medina that he

21  would be up to speak with the defendant.

22          But at about 10:30 that morning, Officer Medina had

23  to start preparing for the daily inmate count.  And the

24  lieutenant still hadn't arrived.  So he called another of his

25  supervisors, the operations lieutenant.  He told him the

1     situation, and the operations lieutenant told Officer Medina

2     just go to the defendant's cell and explain to him that he

3     needs to start following orders or there will be disciplinary

4     action taken against him.

5          So per those instructions, Officer Medina went to

6     the defendant's cell.  He opened the cell door, and he saw

7     that the defendant was sitting on the lower bunk of the cell,

8     across the cell from Officer Medina.  He entered the cell, and

9     he began to talk to the defendant.  The defendant then said

10    something nonsensical and sprung to his feet with his fists

11    clenched in a fighting stance.  Officer Medina hit his body

12    alarm.  And you'll hear that a body alarm is a button that

13    prison guards carry on their person that they can press in

14    case of emergency that sends a signal in the prison to which

15    all prison staff are required to respond.

16         The defendant threw punches at Officer Medina,

17    hitting him in the head.  At this moment, Officer Medina

18    didn't throw punches back.  He didn't reach for a weapon or

19    something to defend himself with.  He attempted to control the

20    situation by placing the defendant in a bear hug, and he did

21    that.  And then he and the defendant were clutched together

22    face to face.  But the defendant launched his body into

23    Officer Medina, knocking Officer Medina backwards.  Officer

24    Medina fell backwards onto the hard concrete cell floor

25    hitting his head and his hand.  He fell so hard that he was

1  knocked out for a couple of seconds.  And when he awoke, there

2  was the defendant over him spitting on him.

3          Officer Medina got to his feet, and this time he was

4  able to restrain the defendant by holding the defendant up

5  against the cell wall.

6          Then officers began to respond to the body alarm.

7  Thereafter, Officer Medina and the defendant were taken to the

8  prison's physician's assistant to be examined.  The

9  physician's assistant determined that Officer Medina had

10  several injuries and that the defendant had none.  While the

11  physician's assistant was examining the defendant, she asked

12  him what happened.  And he responded, "God in Hollywood made

13  me do it."  That's not the only time that you will hear

14  defendant's own words because about two weeks later, FBI

15  agents went to the prison to interview the defendant, because

16  one of the FBI's tasks is to interview federal prison

17  assaults.

18          You'll hear from one of the FBI agents who

19  interviewed the defendant, and he'll tell you that the

20  defendant agreed to speak with him and that he waived his

21  Miranda rights.  And you'll hear that the defendant discussed

22  openly the events of the morning.  But when the agent started

23  asking about Officer Medina's injury, defendant initially

24  didn't know how Officer Medina had been injured, but as the

25  interview went on, slowly grudgingly, the defendant admitted

1    that he had touched Officer Medina.  He said he patted him to

2    calm him down.  But he also admitted that they had struggled

3    and that they had both fell to the floor.

4           The agent asked the defendant, "Were you acting in

5    self-defense," and the defendant said no.  The agent also read

6    to the defendant a statement that he allegedly made about the

7    assault, which was, "I'm sorry.  I'm sorry.  I didn't mean for

8    it to happen.  I'm sorry.  But everything is okay."

9           When the agents read that statement to the

10   defendant, he said, "That sounds like something I would say."

11          Officer Medina suffered several injuries.  He had a

12   throbbing headache, pain in his ribs.  He had an injured hand

13   that he had to wear a splint on for over a month.  And he had

14   a small but deep laceration behind his ear that kept bleeding

15   even after he went to the hospital the first time that day,

16   such that he had to return to the hospital later that evening

17   to get it stitched to stop the bleeding.

18          At the end of the trial, I will have another

19   opportunity to speak with you.  And I will ask you to return

20   the only verdict consistent with this evidence, guilty as

21   charged.

22          Thank you.

23          THE COURT:  Mr. Goldman, would you like to give an

24   opening statement?

25          MR. GOLDMAN:  I would, your Honor.  Thank you.

1         **OPENING STATEMENT BY COUNSEL FOR THE DEFENSE**

2      MR. GOLDMAN:  Two and a half years ago, Daniel

3 Osazuwa was an inmate at the Metropolitan Detention Center.

4 He was serving a 90-day sentence.  He had less than three

5 weeks to go on a 90-day sentence.  During his stay at the

6 Metropolitan Detention Center -- they call it the MDC -- he

7 was housed on the fifth floor.  The fifth floor is reserved

8 for low security inmates, inmates with no history of violence,

9 inmates with no psychological problems, inmates who are to be

10 released shortly.

11      On the morning of April the 14th, Mr. Osazuwa was

12 playing basketball in the rec area behind him.  The night

13 before, he was playing basketball with other inmates, and what

14 they would do is they would bet.  The loser does push-ups, and

15 the winner gets bread.  But that morning, on April the 14th,

16 he was playing alone.  At around 10:20 A.M., he left the

17 recreational area to go back to his cell for the morning

18 count.

19      Now, count is essentially what happens multiple

20 times a day.  And on Saturdays on the week's count is where

21 the inmates are required to go back into their cells.  The

22 guards lock the doors, and then they count everyone to see if

23 everyone is present.

24      So at 10:20 in the morning, he knows that it's time

25 to go to his cell at 10:30.  He passes by the table where the

1   bread is, the bread that they had been betting on the night

2   before.  He grabs a loaf of bread.  He says, "I won," meaning

3   I won the basketball.  He walked by an inmate, pats the inmate

4   on the shoulders, and goes to his cell.  He realizes what am I

5   doing with this bread?  He walks back.  He puts the bread on

6   the table, and he goes back to his cell.

7         At 10:30 -- well, when he goes back to his cell,

8   he's waiting because there's a lockdown.  At 10:30 in the

9   morning, prison guard Oscar Medina comes into his cell, and

10  Mr. Osazuwa -- he can't exactly understand what Mr. Medina is

11  saying.  He can tell that Mr. Medina's frowning.  He can tell

12  that Mr. Medina isn't happy, but he doesn't really know

13  exactly what he's saying.

14        Mr. Osazuwa gets off the bed.  He goes over to

15  Mr. Medina and goes to put his arm around him and go relax,

16  relax, calm down.

17        Mr. Osazuwa did something that is not appropriate.

18  Inmates are not allowed to touch guards.  Not to shake their

19  hands, not to pat them on the shoulder, not put their arms

20  around them.  The guard acts instinctively, reflexively, and

21  he knocks Mr. Osazuwa's arm off him.  He starts to fall back.

22  He starts to lose his balance.  And he reaches out, and what

23  he reaches for is Mr. Osazuwa, to maintain his balance.

24        Mr. Osazuwa is not exactly a big guy.  Mr. Medina

25  falls back, and Mr. Osazuwa falls on top of him.  Both then

 1   fall to the ground.  Mr. Osazuwa gets up.  Mr. Medina gets up.

 2         Now, Mr. Medina tells a much different story.  He

 3   says that Mr. Osazuwa, a man with less than three weeks to go

 4   on a 90-day sentence, a man with no history of violence at

 5   MDC, a clear conduct record, a reputation for getting along

 6   with all the staff members, out of the blue attacks him,

 7   unprovoked, viciously.

 8         The problem with Mr. Medina's story is that it

 9   changes.  It doesn't change once.  It doesn't change twice.

10   It changes at least three times.  So his stories not only

11   conflict with one another, but his stories conflict with

12   common sense, and more importantly, ladies and gentlemen, his

13   stories, Mr. Medina's stories are flatly contradicted by the

14   physical evidence, flatly contradicted by the physical

15   evidence.

16         Regarding these multiple and conflicting stories,

17   where are the conflicts?  The conflicts are in the time that

18   the events occurred, what specifically occurred, how

19   Mr. Osazuwa supposedly assaulted Mr. Medina, and how

20   Mr. Medina was injured.

21         Let me talk to you about some of the stories that

22   Mr. Medina tells.

23         Mr. Medina is required to keep a log.  You'll have

24   an opportunity to see that log.  And he makes two entries

25   about Mr. Osazuwa.  The first entry deals with Mr. Osazuwa

touching an inmate on the shoulders and Mr. Medina going to

the inmate and saying what's going on, and the inmate says,

"Mr. Osazuwa is gay, and I don't want him touching me because

who knows what he could have, what disease he could have.  I

don't want him touching me."

        The next entry occurs at 9:30 in the morning.  And

those are the comments with respect to Mr. Osazuwa's conduct.

The problem is that the time changes because two weeks later,

Mr. Medina gets to speak to an FBI agent, actually, two FBI

agents.  And what he says is, "Well, you know what?  It didn't

happen at 9:30.  It happened at 10:30."  In his log he says

oh, I locked Mr. Osazuwa in his cell at 9:30, but then when he

talks to the FBI agents, he doesn't say anything about locking

Mr. Osazuwa in his cell.

        He says Mr. Osazuwa leaves the rec area, goes to his

cell in anticipation of the count.

        Let's talk about the multiple stories that

Mr. Medina will tell about the assault.  Shortly after the

assault, and when I mean shortly after the assault, I mean two

hours after this story about Mr. Osazuwa assaulting Mr.

Medina.  Mr. Medina sits down with his superior, a Lieutenant

Sigala, and he writes a report.  And he writes about what he

says happened.  And what he says happened is that he enters

Mr. Osazuwa's cell.  He opens the door.  Mr. Osazuwa gets up

off the bed and charges at him.  Just charges.  And he lands

1   punches.  He hits him with his left hand.  He hits him twice

2   with his right hand.  And what he says is that Mr. Osazuwa

3   causes a laceration behind his left ear.

4           Two weeks later, Mr. Medina speaks to the FBI, and

5   he says -- another changed story.  He says, "Well, I walked

6   into Mr. Osazuwa's cell.  Mr. Osazuwa gets up.  He stands in

7   front of me, and he raises his fists and punches me."

8           Now, let's talk about the changing stories that

9   Mr. Medina tells about how he gets injured.  He says to his

10  superiors, on the day that this thing happened, he says, "I

11  got a laceration behind my left ear because Mr. Osazuwa

12  punched me twice behind my left ear.  That's how it happened."

13          Two weeks later, Mr. Medina speaks to the FBI and

14  says, "You know what?  I got injured when I fell back down,

15  and I hit my ear behind the doorjamb.  Yeah, that's how it

16  happened."

17          Two years later, he tells another story, meaning

18  Mr. Medina tells another story.  He says, "Well, I guess I

19  didn't get the cut behind my left ear from the doorjamb.  It

20  was because Mr. Osazuwa hit me."  Mr. Medina's stories

21  conflicted with the physical evidence.  In his story on the

22  14th of April, to his superiors, and in his testimony in

23  another matter on January the 23rd, 2009, he claims that

24  Mr. Osazuwa is the one who puts a laceration behind his ear.

25  One time he says he -- Mr. Osazuwa hits him twice.  Another

1    time he says he hits him once.  He says the punch was so solid

2    that it caused this two-centimeter laceration.  The physical

3    evidence flatly contradicts what Mr. Medina said.  Why?

4    Because there is absolutely no marks on Mr. Osazuwa's hand.

5    Not on his right hand or not on the right hand which

6    Mr. Medina says delivers the punches.  Not a scrape, not a

7    swelling, not a bruise, not blood, not anything.  Nothing.

8         Let's talk for a moment with respect to Mr. Medina

9    claiming Mr. -- claiming that he told Mr. Osazuwa that he told

10   him to change his clothes three times.  And let's also talk

11   for a moment about Mr. Osazuwa taking bread and screaming and

12   cursing at Mr. Medina.

13        According to Mr. Medina, all of these things occur

14   in the common area at the MDC, an area where there are inmates

15   sitting around, an area which, when you look up on the

16   ceiling, has surveillance cameras.  Surveillance cameras.  And

17   you're going to see the cameras.  But what you're not going to

18   see are any photographs of any interaction between Mr. Osazuwa

19   and Mr. Medina, such as conversation.  You're not going to see

20   any photographs of Mr. Medina taking a loaf of bread, throwing

21   it on the ground, and shouting at Mr. Medina.  You're not

22   going to see those.  Why?  Because it doesn't exist and

23   because what Mr. Medina said didn't happen.  And, ladies and

24   gentlemen, what you're not going to hear from are any

25   witnesses, any inmates who said oh, yes, we were there, and we

1    saw Mr. Osazuwa scream at Mr. Medina.  You're not going to

2    hear any guards testify that they saw Mr. Osazawa do this.

3            So what are we left with here?  Well, we don't have

4    photographs.  We don't have witnesses other than Mr. Medina.

5    We don't have physical evidence that's consistent with

6    Mr. Medina smashing -- excuse me, with Mr. Osazuwa smashing

7    Mr. Medina behind the left ear.  We have multiple stories by

8    Mr. Medina, conflicting multiple stories, stories unsupported

9    by any independent evidence, and I mean either witnesses or

10   photographs, and stories flatly contradicted by the physical

11   evidence in this case.

12           And you're going to hear that when a medical

13   assistant examined him, clean.  No marks on any of his hands.

14   No indication that he delivered a blow that would cause that

15   kind of mark.  Okay?  Bone hitting bone.  No indication on his

16   hands at all.  After you hear all of this evidence in this

17   case, you're going to wonder why Mr. Osazuwa was prosecuted.

18           Thank you.

19           THE COURT:  Thank you.  Ms. Sanneman, would you like

20   to call your first witness.

21           MS. SANNEMAN:  Yes, your Honor.  The government

22   calls Oscar Medina.

23           THE CLERK:  Please step forward.  Please raise your

24   right hand.

25                   **OSCAR MEDINA, SWORN.**

```
1            THE CLERK:  Thank you.  Please be seated.  Please

2    step forward to the witness stand.  Please be seated, and

3    state your full name for the record and spell it.

4            THE WITNESS:  My name is Oscar O-S-C-A-R, Medina,

5    M-E-D-I-N-A.

6            THE COURT:  You may proceed.

7                      DIRECT EXAMINATION

8    BY MS. SANNEMAN:

9    Q.   Mr. Medina, are you employed?

10   A.   Yes, I am.

11   Q.   Who do you work for?

12   A.   The Department of Justice.

13   Q.   Where do you work?

14   A.   At the Metropolitan Detention Center.

15   Q.   What is the Metropolitan Detention Center?

16   A.   It's a federal detention prison located here in

17   Los Angeles.

18   Q.   What was your title at the Metropolitan Detention Center

19   on April 14, 2007?

20   A.   Senior correctional officer.

21   Q.   You said you were employed by the Department of Justice?

22   A.   Yes.

23   Q.   Specifically any particular agency?

24   A.   The Federal Bureau of Prisons.

25   Q.   Were you on duty on April 14, 2007?
```

```
 1   A.   Yes.

 2   Q.   Does that day stand out in your mind for any reason?

 3   A.   Can you repeat the date?

 4   Q.   April 14, 2007.

 5   A.   That's the day I was assaulted.

 6   Q.   Who assaulted you?

 7   A.   It was Inmate Osazuwa.

 8   Q.   Do you see that person in the courtroom today?

 9   A.   Yes, I do.

10   Q.   Could you indicate for the record where he's sitting and

11   what he's wearing?

12   A.   He's directly in front of me, and he's wearing a tie with

13   a sweater.

14        THE COURT:  Indicating the defendant.

15   Q.   BY MS. SANNEMAN:  What, if anything, did you review in

16   preparation for your testimony here today?

17   A.   My daily log activities book.

18   Q.   Anything else?

19   A.   I believe there was transcripts.

20   Q.   Transcripts.  From a prior proceeding?

21   A.   Correct.

22   Q.   Is that your testimony in a prior proceeding?

23   A.   Yes.

24   Q.   Did you review any reports?

25   A.   Yes, I did.
```

1   Q.   Any photographs?

2   A.   Yes.

3   Q.   Where at MDC -- or Metropolitan Detention Center, is it

4   typically referred to as the MDC?

5   A.   Yes, it is.

6   Q.   Okay.  Where at the MDC were you on duty on April 14,

7   2007?

8   A.   I was on duty on 5 North.

9   Q.   What is 5 North?

10  A.   5 North, it's a working cadre unit where we house inmates

11  that basically they are working inmates that do different

12  functions in the prison.

13  Q.   Do they have a particular color of uniform that they

14  wear?

15  A.   Yes.

16  Q.   What color is that?

17  A.   They are brown khaki pants with brown shirt.

18  Q.   Why do they wear that color?

19  A.   That's how we identify the inmates from 5 North.

20  Q.   And when you say "we," who do you mean?

21  A.   The staff and the correctional officers.

22  Q.   What were your responsibilities at the MDC on April 14,

23  2007?

24  A.   I was the officer in charge of the unit, of 5 North.

25  Q.   What shift were you working?

1   A.    I was working day watch, which is from 6:00 A.M. to 2:00

2   P.M.

3   Q.    What day of the week was April 14, 2007?

4   A.    It was a Saturday.

5   Q.    At that time did you usually work a Saturday 6:00 to 2:00

6   shift?

7   A.    That Saturday, no.

8   Q.    What were you doing on 5 North on the day shift that

9   Saturday?

10  A.    I was assigned to another unit, and I ended up switching

11  with a co-worker.

12  Q.    Were you familiar with 5 North before that day?

13  A.    Yes.

14  Q.    How so?

15  A.    Prior to that, I was the quarter officer for the unit.

16  Q.    What's a quarter officer?

17  A.    Every three months we switch different units, and that

18  was the unit that I was assigned for -- to.

19  Q.    And do you remember when -- or when were you a quarter

20  officer for that unit?

21  A.    I believe it was sometime in December, December through

22  March.

23  Q.    Of 2006 to 2007?

24  A.    Correct.

25  Q.    So your quarter officer assignment ended a little

1    before -- more than a month before the attack approximately?

2    A.    Yes.

3    Q.    About a month before.

4             Approximately how many inmates were in 5 North on

5    April 14th, 2007?

6    A.    We have anywhere between 120 to 130 inmates.

7    Q.    In that one unit?

8    A.    Yes.

9    Q.    Are they housed in cells?

10   A.    Yes, they are.

11   Q.    How many inmates per cell?

12   A.    Generally there's two.  A lot of times we just have one

13   inmate per cell.

14   Q.    Generally speaking, do the inmates spend most of their

15   time during the day in their cell?

16   A.    No.

17   Q.    And this would be true for 5 North inmates as well?

18   A.    Yes.

19   Q.    Where do they spend their time, then, if it's not in the

20   cell?

21   A.    We have a common area where the inmates are able to play

22   cards or checkers.  We have a common area.  We have a

23   recreation area where they go out and play baseball -- I'm

24   sorry -- basketball.  And we have pool tables out where they

25   go also.

1   Q.   Are inmates required to be in their cell at any point

2   during the day?

3   A.   It depends what day.

4   Q.   For instance, on Saturday.

5   A.   On Saturday we have an 11:00 institution count.

6   Q.   What's that?

7   A.   It is -- I believe it's nationwide.  What they do, we

8   count for every inmate, and they have to be assigned and

9   locked in their assigned cell so we can do a visual inspection

10  that we actually see them in the cell.  We do a count.

11  Q.   What do you call the process by which you put the inmates

12  in their cells prior to the count?

13  A.   It would be called lockdown.

14  Q.   When you were assigned as the unit officer for 5 North on

15  April 14, 2007, were any other guards assigned to 5 North with

16  you?

17  A.   No.

18  Q.   Were you armed?

19  A.   No.

20  Q.   Is 5 North on the ground floor of the prison?

21  A.   It would be located on the fifth floor.

22  Q.   And how many levels does 5 North have?

23  A.   It has -- it's a tri-story.  So it would have three

24  levels.

25              MS. SANNEMAN:  Your Honor, at this time I would like

1    to show the defendant some exhibits which are here.  May the

2    agent approach?

3              THE COURT:  All right.  I understand the exhibits

4    are already agreed to be in evidence.  So you can just go

5    ahead and show the witnesses anything you want.

6              MS. SANNEMAN:  Exhibit 1.  Thank you.

7              MR. GOLDMAN:  Your Honor, may I confer with the

8    prosecutor, please?

9              THE COURT:  Sure.

10                         (Pause.)

11   Q.  BY MS. SANNEMAN:  All right.  Mr. Medina, will you please

12   take out Exhibit 1.

13   A.  Okay.

14   Q.  Do you recognize it?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  It would be the floor plan of 5 North.

18             MS. SANNEMAN:  Your Honor, the government moves to

19   admit Exhibit 1 for the record.

20             THE COURT:  All of your exhibits are admitted,

21   Counsel.

22             MS. SANNEMAN:  Thank you.

23             Permission to publish, your Honor.

24             THE COURT:  You don't need to ask for permission to

25   publish.

1          MS. SANNEMAN:  May I have a moment, your Honor?

2    Q.    Mr. Medina, are there elevators that travel to 5 North?

3    A.    Yes.

4    Q.    Looking at the Exhibit 1, could you describe -- and I'll

5    ask you to describe with your words because the court reporter

6    can't describe any pointing -- where the elevators are on the

7    diagram?

8    A.    They would be the boxes with an X on them.

9    Q.    Toward the bottom?

10   A.    Towards the bottom, yes.

11   Q.    And what is the long, dark, narrow area outside of the

12   elevators?

13   A.    That would be the hallway.

14   Q.    Is there another name for that?

15   A.    We generally -- it's called a sally port.

16   Q.    Where is 5 North located in relationship to the sally

17   port?

18   A.    It would be towards the -- straight ahead.

19   Q.    Towards the top of the diagram?

20   A.    Yes.

21   Q.    What's at the other end of the sally port?  I know it's

22   not pictured on here.

23   A.    The other way would be the 5 South unit.

24   Q.    Is there anything that separates 5 North from the sally

25   port?

1    A.    It would be a metal door.

2    Q.    Can the inmates come and go as they please through that

3    door, or is it secured?

4    A.    It is a secure door.

5    Q.    Looking at the diagram, what is the dark area in the

6    center of the -- top center of the diagram?

7    A.    That would be the multi-purpose room, which we call it

8    the common area.

9    Q.    And again, what's in that area?

10   A.    We have tables where the inmates would eat and also play

11   their checkers or their cards.

12   Q.    What about the area to the lower right of the common area

13   that says food service on the diagram?  What is that?

14   A.    That would be our kitchen area where the inmates prepare

15   the food.

16   Q.    Is there any food stored there, then?

17   A.    There's refrigerators there, yes.

18   Q.    What about the area further to the right and below it of

19   the food service area, the recreation deck.  What is that?

20   A.    That is where they play basketball.  We have basketball

21   courts up.

22   Q.    You said that 5 North was tri-level.  Are there stairs

23   within 5 North, then?

24   A.    Yes.

25   Q.    Where are the stairs, or can you see them in this

```
 1   diagram?
 2   A.    I can see them, yes.
 3   Q.    Where are they, if you can describe?
 4   A.    They would be -- kind of looks like a box that has
 5   little -- where you're pointing.
 6   Q.    Okay.  The box with the lines here?
 7   A.    No, the box where the little lines are across.
 8   Q.    Yes.  And how many flights of stairs do you see in the
 9   diagram?
10   A.    There would be four.
11   Q.    And is that consistent with how many are in 5 North?
12   A.    Yes.
13   Q.    The stairs closest to the top of the diagram, where do
14   those lead to?
15   A.    Closest to the diagram?
16   Q.    Closest to the top of the diagram.
17   A.    That would lead up to the top section.
18   Q.    And the stairs below those stairs, where do those lead
19   to?
20   A.    They would lead to the bottom section.
21   Q.    Now, looking at the boxes that are running across the
22   stop of the top of the diagram, what are those?
23   A.    They would be the cells that the inmates are in.
24   Q.    And where would those cells be located?
25   A.    It depends what we're talking about.
```

1   Q.   What floor?

2   A.   The bottom floor.  We have either C or D range in the

3   bottom floor.

4   Q.   And the top floor?

5   A.   That would be A and B range.

6   Q.   Using this diagram, can you describe where you were

7   stationed April 14, 2007?

8   A.   It would be where the multi-purpose room is next to the

9   stairs that lead up to the upper section, which would be A and

10   B range.

11   Q.   Do you have a desk?

12   A.   Yes, I do.

13   Q.   Using the diagram -- well, first of all, let me ask you,

14   do you recall -- where did the assault take place?

15   A.   It was at the bottom range, on D range, the bottom floor.

16   I'm sorry.

17   Q.   Do you remember the cell number?

18   A.   Yes.

19   Q.   What was that?

20   A.   It was 541.

21   Q.   Using the diagram, can you identify where cell 541 would

22   be located?

23   A.   It would be -- it's kind of hard to explain.

24   Q.   Maybe if you're starting from the center of the diagram?

25   A.   Where the center is, where it has the three or four boxes

1    with the X's.  That would be the showers, and three cells down

2    to my right.  Your left.  Right there.

3    Q.    And each one of these small boxes represents a cell?

4    A.    Yes.

5    Q.    If you could look at Exhibit 2.

6    A.    Okay.

7    Q.    Do you recognize that exhibit?

8    A.    Yes.

9    Q.    What is it?

10   A.    That would be the top area of the unit, which would be A

11   and B range.

12   Q.    What is on the top area?

13   A.    It's the TV room.

14   Q.    Are there any cells up there?

15   A.    Yes.

16   Q.    And in this diagram, like the last one, how are the cells

17   depicted?  Are they the boxes?

18   A.    They are the boxes, correct.

19   Q.    Was the defendant being housed in 5 North on April 14,

20   2007?

21   A.    Yes.

22   Q.    Do you remember seeing the defendant before April 14,

23   2007?

24   A.    No.

25   Q.    At some point on April 14, 2007, did you take note of the

1   defendant?

2   A.    Yes.

3   Q.    Do you remember the first time you noticed him?

4   A.    I noticed Mr. Osazuwa was in the common area sitting --

5   walking by, and there was an inmate by the name of Bushnell.

6   And Mr. Osazuwa placed both hands and patted him on his back.

7   Q.    And why did you notice that?

8   A.    Because Inmate Bushnell became very angry, and they had

9   some words exchanged.  And Mr. Osazuwa walked away.

10  Q.    What did you do after seeing this?

11  A.    I noted it on my logbook, or my daily activity book, and

12  I approached Inmate Bushnell, and I asked him what just

13  occurred.

14  Q.    And did he tell you what happened?

15  A.    Yes.

16  Q.    What did the inmate tell you?

17  A.    He said that he didn't like anybody touching him, and he

18  became very angry at that, and that he was concerned because

19  Inmate Osazuwa was openly gay, and that he had AIDS.  That's

20  what he told me.

21  Q.    Was defendant's sexuality a concern to you?

22  A.    No.

23  Q.    Were you concerned about the interaction between the

24  defendant and the inmate?

25  A.    Yes, I was.

1    Q.    Why?

2    A.    Because in the jail environment, any tension -- they

3    fight over anything.  And for another inmate to put a hand on

4    another inmate, it just was -- could have caused a lot of

5    problems in that unit.

6    Q.    What -- about what time did this occur?

7    A.    About 8:35 A.M.

8    Q.    Did you notice the defendant later on April 14, 2007?

9    A.    Yes.

10          THE COURT:  Before we get any further into that,

11   Ms. Sanneman, we'll take our 15-minute break.

12          Ladies and gentlemen, don't talk about the case or

13   form or express any opinions about the case until it's finally

14   submitted to you.  We'll have Ms. Plato show you the jury room

15   so that you'll know where you'll be going.

16          (Recess taken.)

17          THE COURT:  Everyone is present.  Ms. Plato wouldn't

18   let you take the shortcut to the jury room.  That's an area we

19   call the well.  I don't know why we call it the well.  But it

20   comes from England, where the court system originated, but by

21   tradition, no one is allowed to walk in that area other than

22   court staff.

23          Ms. Sanneman?

24   Q.    BY MS. SANNEMAN:  Officer Medina, did you again notice

25   the defendant later on April 14th, 2007?

1    A.   Yes.

2    Q.   Why did you notice the defendant this time?

3    A.   He was wearing green clothing versus the brown khaki

4    pants and brown shirt.

5    Q.   And why did that matter to you?

6    A.   Because everyone in 5 North, they need to be in the

7    proper color clothing so we can identify them.

8    Q.   What did you do when you saw the defendant in this

9    improper attire?

10   A.   I approached him, and I asked him if he had his brown

11   clothing, and I asked him to change into his clothing, and he

12   mumbled -- he mumbled something, and he walked away.

13   Q.   Did you yell these orders at him?

14   A.   No.

15   Q.   What did you do -- how did you speak to him?  In what

16   tone of voice?

17   A.   The same tone I'm speaking now.

18   Q.   What did you do after you talked to the defendant about

19   the improper attire?

20   A.   I repeated the question.  I'm sorry.

21   Q.   What did you do after you spoke to the defendant?

22   A.   I went back to my desk, and I sat down.

23   Q.   When the defendant responded to you, did you feel that he

24   was paying attention to you?

25            MR. GOLDMAN:  Your Honor, I'm going to object to

1    that.   Improper foundation.

2              THE COURT:   Overruled.

3              THE WITNESS:   No, I did not.   He was not paying

4    attention to me.

5    Q.   BY MS. SANNEMAN:   Do you believe, however, by his

6    response, that he heard you?

7              MR. GOLDMAN:   Objection.   Speculation.

8              THE COURT:   Why don't you rephrase your question.

9    Q.   BY MS. SANNEMAN:   Did the defendant do anything to

10   indicate to you that he heard you?

11   A.   No.

12   Q.   Did he respond to your question, however?

13   A.   He mumbled something, and then he walked away.

14   Q.   Did you again notice defendant on April 14, 2007?

15   A.   Yes.

16   Q.   What did you notice about him this time?

17   A.   He was still wearing the green clothing.

18   Q.   Did you attempt to talk to him about this again?

19   A.   Yes, I did.

20   Q.   How did you do that?

21   A.   I again approached him.

22   Q.   And where was he at that point?

23   A.   He was in the recreation area.

24   Q.   What was the defendant doing?

25   A.   I don't really recall what he was doing.   I don't know if

1   he had a basketball or he had something in his hand.

2   Q.   Did you say anything to him?

3   A.   Yes, I did.

4   Q.   What did you say to him?

5   A.   I reiterated what I had told him previously about

6   changing into his proper clothing.

7   Q.   What was his response this time?

8   A.   He again really wasn't paying attention to me.  He

9   mumbled, and he walked from the recreation area through the

10  kitchen area.

11  Q.   What did he do next?

12  A.   He grabbed a loaf of bread that was on the table.

13  Q.   Was the defendant allowed to take this loaf of bread?

14  A.   No.

15  Q.   Why not?

16  A.   Well, again, it causes a major problem when someone else

17  other than the inmate that's actually receiving the food grabs

18  anything that does not belong to him.

19  Q.   Was this bread shared in the -- among the inmates?

20  A.   Yes.

21  Q.   What did you do next?

22  A.   I shouted at him, and I told him to put the bread down.

23  Q.   How did the defendant respond that time?

24  A.   He -- I remember he turned around.  He looked at me.  And

25  he shouted, "Fuck you," and he dropped the bread.

1   Q.   What did he do after that?

2   A.   He walked down to his -- I believe it was his cell.

3   Q.   What was your response?

4   A.   Generally I was shocked at first.  I didn't want to

5   create a really big problem on the floor.  So I went and I

6   picked up our phone, and I called the activities lieutenant,

7   Barnett.

8   Q.   And why didn't you follow the defendant to wherever it

9   was he was going?

10  A.   Being that it seemed like he was upset, I didn't want to

11  put myself in that situation, and our chain of command would

12  be just to go and notify the lieutenant of what just occurred.

13  Q.   Do you remember at about what time that incident occurred

14  with the bread and whatnot?

15  A.   I don't recall exactly the time, no.

16  Q.   Is there anything that I could show you that would

17  refresh your recollection as to the time it occurred?

18  A.   My daily activity log.

19  Q.   If you could pull out what has been previously marked for

20  identification purposes as Exhibit 19, I believe it's in the

21  folder you have out.

22       Do you recognize that?

23  A.   Yes, I do.

24  Q.   And what is it?

25  A.   It is a copy\of my daily activity log.

1    Q.    Could you please take a look at that and then when you're

2    done, put it down and tell me if it refreshes your

3    recollection.

4    A.    Okay.  Yes.

5    Q.    What time did the incident with the bread occur?

6    A.    Would be at 9:30.

7    Q.    If you could now take out what has previously been marked

8    as Exhibit 3.

9    A.    Okay.

10   Q.    Do you recognize that photograph?

11   A.    Yes, I do.

12   Q.    What is it?

13   A.    It would be the floor of the common area.

14   Q.    Looking toward the center of the photograph, there's a

15   door there.  What is that?

16   A.    That would be the sally port door.

17   Q.    And then the hallway leading out from it, what is that?

18   A.    That would be the hallway leading to the other side of

19   the unit, which was 5 South.

20   Q.    And is that the sally port, then?

21   A.    Yes.

22   Q.    Here in the lower right-hand corner, there's a table.

23   What is that used for?

24   A.    That would be used for the inmates to eat.

25   Q.    Do they do anything else with that table?

1    A.    They play their cards or checkers.

2    Q.    And looking over sort of to the center of the page,

3    there's a phone there.  Who uses that phone?

4    A.    The white or yellow phone would be the officer's phone.

5    Q.    And is that the phone that you used to call the

6    activities lieutenant?

7    A.    Yes.

8    Q.    Looking at Exhibit 4.  It would be in the folder as well.

9    A.    Okay.

10   Q.    Do you recognize this photo?

11   A.    Yes.

12   Q.    What is it?

13   A.    That would be where the kitchen area would be, the food

14   service.

15   Q.    And particularly could you describe where the food

16   service area would be?  Is it to the left of the page, to the

17   right of the page?

18   A.    It would be on the left of -- my left.  It would be where

19   the white area is at in the bottom.

20   Q.    I'm indicating in the sort of middle left area, that

21   area.

22   A.    Yes.

23   Q.    The barred area in the photographs sort of in the center

24   of the picture, what is that?

25   A.    That would be the recreation area.

1   Q.   So is that beyond those bars?

2   A.   Yes.

3   Q.   One more question.  In that food service area, is that

4   where the bread was sitting?

5   A.   Yes.

6   Q.   Looking at Exhibit 5 now, do you recognize that exhibit?

7   A.   Yes.

8   Q.   What is it?

9   A.   Actually, that's a better picture of the common -- the

10  kitchen area and the recreation area.

11  Q.   And the kitchen area, again, where would that be located?

12  A.   Best to describe it would be where the white area is at.

13  Q.   Indicating sort of in the middle of the page?

14  A.   Correct.

15  Q.   All right.  And the barred area.  What is that?

16  A.   That's the recreation area.

17  Q.   All right.  Exhibit 6 now, Officer Medina.

18       What is that photograph?

19  A.   That would be the common area and also the top section of

20  the cells.

21  Q.   When you say the top section of the cells, are those

22  located presumably where the stairs are leading up?

23  A.   Correct.  That would be B range.

24  Q.   Now, I'm looking over at the left-hand side of the page

25  at sort of a rail and an opening.

1          What is that?

2    A.   That's the stairs leading on the bottom of the -- of

3    where the cells are, which would be D range.

4    Q.   So there's a bottom level.  There's this middle level,

5    and then there's the upper level?

6    A.   Correct.

7    Q.   You said the bottom level is D range?

8    A.   Yes.

9    Q.   And where was defendant located?

10   A.   In D range.

11   Q.   Is the area where defendant dropped the bread visible in

12   this photo?

13   A.   Yes, it is.

14   Q.   And where would that be, approximately?

15   A.   It would be -- where the stairs leading upward to the B

16   range and the stairs leading down to B range, it would be in

17   that area in the center.

18   Q.   Those two stairways on the floor --

19   A.   Yes, where the tables are flipped up.  In between them.

20   Q.   You say the two tables.  I'm pointing to a table flipped

21   up sort of in the middle of the page?

22   A.   Yes.

23   Q.   And there's -- I don't know if there are two.  Are you

24   talking about this table as well, or is this a table to the

25   left?  Is there a table over here?

1  A.   The table to the left next to the stairway leading to the

2  bottom.

3  Q.   Okay.  So the -- just to confirm, the bread was dropped

4  somewhere between these two tables in that area?

5  A.   Yes.

6  Q.   When you called the activities lieutenant, were you able

7  to reach him or -- is it a man or a woman?

8  A.   It's a male.

9  Q.   Were you able to reach him?

10  A.   Yes, I did.

11  Q.   What is the activities lieutenant?

12  A.   Activities lieutenant is in charge of the institution.

13  He works alongside with the operations lieutenant.

14  Q.   Did you have a -- would he be a supervisor or a superior

15  to you?

16  A.   He'd be a superior, yes.

17  Q.   Did you have a discussion with the lieutenant?

18  A.   By phone, yes, I did.

19  Q.   And did you do certain things based on that discussion?

20  A.   Yes.

21  Q.   What did you discuss with the activities lieutenant?

22  A.   I basically told him exactly what had went on with the

23  bread incident and the patting on the back of Inmate Bushnell

24  and the wrong clothing that he was wearing.  And he told me to

25  secure him in his cell.

1   Q.   What does that mean, to secure him in his cell?

2   A.   Basically just locking him in his cell.

3   Q.   What did you do next?

4   A.   I did just that.

5   Q.   Okay.  And did you -- you actually went to the

6   defendant's cell then?

7   A.   Yes.

8   Q.   And you locked the door.

9        Did you -- the incident with the bread that we've

10  been talking about, did you note that incident in your

11  logbook?

12  A.   No, I didn't.

13  Q.   Did you note generally what happened at that time?

14  A.   Yes, I did.

15  Q.   Did you note the conversation you had with the activities

16  lieutenant in your logbook?

17  A.   Yes, I did.

18  Q.   Okay.  I will ask you again to look at Exhibit 19.

19  A.   Okay.

20  Q.   Do you recognize it?

21  A.   Yes, I do.

22  Q.   What is it?

23  A.   It's a copy of my daily activities log.

24  Q.   For what date?

25  A.   For April 14, 2007.

1   Q.   And do you recognize the entries in that log as the ones

2   that you made?

3   A.   Yes.

4   Q.   Is this a fair and accurate copy of the notes that you

5   took in your logbook --

6           THE COURT:  Do you have any objection to this?

7           MR. GOLDMAN:  No, your Honor, not at all.

8           THE COURT:  All your exhibits are in, Ms. Sanneman.

9           MS. SANNEMAN:  Yes, your Honor.

10  Q.   Is it a fair and accurate copy?

11  A.   Yes.

12  Q.   Looking at the first page of the exhibit, what is that?

13  A.   That would be the front cover copy of our daily

14  activities logbook.

15  Q.   And does it indicate the unit on there?

16  A.   Yes.

17  Q.   What do the open and close dates represent?

18  A.   That's the day we opened the book on March 17th, and the

19  day we closed it is when we ran out of pages.

20  Q.   Looking at the second page, then, of the log.  What are

21  the times or the numbers on the left-hand side of the page?

22  A.   Can you rephrase?

23  Q.   The numbers on the left-hand side of the page, 6:00 A.M.,

24  6:15 A.M., what do those represent?

25  A.   That would be the time that we start our unit -- working

1    in the unit.  I'm sorry.

2    Q.   And as you -- what do those times generally represent

3    about the wording next to them?  Is that the time that things

4    occurred?

5    A.   Generally, yes.

6    Q.   And where exactly do your entries begin?

7    A.   It begins on -- at 6:00 A.M. on day watch.

8    Q.   Are there entries above your entries?

9    A.   Yes.

10   Q.   Are those yours?

11   A.   No.

12   Q.   Looking at the third page, do you see your entries on

13   this page?

14   A.   Yes, I do.

15   Q.   Where do your entries end on this page?

16   A.   At 10:20 A.M.

17   Q.   The entries after that, are those your entries?

18   A.   No.

19   Q.   Now, looking back at the second page, do you see an entry

20   at 8:35 A.M.?

21   A.   Yes.

22   Q.   What were you describing there?

23   A.   The incident that Inmate Bushnell -- I'm sorry.  Excuse

24   me, Inmate Osazuwa, when he patted Bushnell on the back.

25   Q.   Looking at the next page, the third page, the very top of

1    the page.  That first entry, what were you describing there?

2    A.   That would be the incident where he became very angry and

3    said "Fuck you" to me and dropped the bread.

4    Q.   Did you mention the bread in that entry?

5    A.   No.

6    Q.   Why not?

7    A.   I didn't really think it was pertinent.

8    Q.   Are these entries, do they contain every detail of what

9    you were trying to note on your log generally speaking?

10   A.   No.

11   Q.   So they don't contain every detail of every -- of

12   whatever incident you're trying to note?

13          MR. GOLDMAN:  Your Honor, I'm going to object to the

14   question.

15          THE COURT:  Sustained.

16   Q.   BY MS. SANNEMAN:  Do you note everything that happens

17   every day in your log?

18   A.   No.

19   Q.   And again, when you do note something in your log, do you

20   describe every detail?

21   A.   No, we don't.

22   Q.   Why not?

23   A.   We'd be there all day.

24   Q.   One more question about the log.  There are some numbers

25   toward the center of the page, minus one, minus three.  What

1    are those?

2    A.    On the first column, it would be the amount of inmates we

3    have on the floor.  The second column would be the inmates

4    that are remaining on the floor, and the third would be the

5    inmates that are out on work assignments.

6    Q.    Okay.  You're talking about at the very right of the

7    page, then, those numbers?

8    A.    Yes.

9    Q.    And toward the left of the page, there are numbers that

10   are minus one, minus three, minus nine, and are circled.  What

11   do those represent?

12   A.    Represents inmates that are out of the floor of the unit.

13   Q.    What happened after you went to the defendant's cell and

14   locked it?

15   A.    I went back to my desk.

16   Q.    And did the activities lieutenant ever arrive?

17   A.    Lieutenant Barnett?

18   Q.    Yes.

19   A.    No, he did not.

20   Q.    What did you do next that morning?

21   A.    Well, I continued my daily activity.  And that was -- and

22   I was getting concerned because it was getting close to the

23   10:30 mark.

24   Q.    And what was important about the 10:30 mark?

25   A.    10:30 is when we begin to lock our unit down for the

1    11:00 count.

2    Q.    What did do you as that time approached?

3    A.    I went to our -- my phone, and I ended up calling -- I

4    dialed the lieutenant's complex, and I spoke to Operations

5    Lieutenant Sigala.

6    Q.    What's an operations lieutenant?

7    A.    He's in charge of the whole institution when the captain

8    and the warden is not in the institution.

9    Q.    And why did you call him?

10   A.    Actually, I was trying to call Lieutenant Barnett.

11   Operations Lieutenant Sigala ended up answering the phone.

12   And I just wanted to tell him if he knew anything about what

13   was going on.

14   Q.    About what was going on with what?

15   A.    With what had occurred earlier.

16   Q.    With?

17   A.    With Inmate Osazuwa.

18   Q.    And did you tell Lieutenant Sigala what had happened?

19   A.    Yes, I did.

20   Q.    And did he give you instructions during your

21   conversation?

22   A.    Yes, he did.

23   Q.    Did you later follow those instructions?

24   A.    Yes.

25   Q.    What did you discuss with Lieutenant Sigala?

1   A.   I told him what had occurred.  I told him that I spoke to

2   Lieutenant Barnett, and I was getting concerned because it was

3   getting close to my lockdown time.  So he told me since I have

4   you on the phone, let me run, and I don't know exactly what

5   it's called, just to see what type of inmate we were dealing

6   with.

7   Q.   All right.  And did Lieutenant Sigala do that?

8   A.   Yes.

9   Q.   And what happened next?

10  A.   Well, he looked at his inmate disciplinary record, and he

11  had never been in trouble before.

12  Q.   Okay.  And what happened after that?

13  A.   He told me with that information, to go to the cell,

14  unlock it, and talk to him and tell him if he did not comply

15  with the regulations, that he was going to come and officially

16  lock him down.

17  Q.   What did you do after speaking with Lieutenant Sigala?

18  A.   I did just that.

19  Q.   And what was that?

20  A.   I went to his cell.

21  Q.   Okay.  If you could look at Exhibit 10.

22  A.   Okay.

23  Q.   Do you recognize that exhibit?

24  A.   It would be a cell.

25  Q.   Okay.  Does it appear to be the defendant's cell?

1   A.   I couldn't really tell.

2   Q.   Does it look like how the defendant's cell was

3   configured?

4   A.   Yes.

5         MR. GOLDMAN:  Your Honor, we'll stipulate that it's

6   Mr. Osazuwa's cell.

7   Q.   BY MS. SANNEMAN:  Now, what did you do when you arrived

8   at the defendant's cell?  First of all, was the door open or

9   closed?

10  A.   It was closed.

11  Q.   And what did you do when you arrived?

12  A.   There's a little window on the side.  I remember looking

13  in the window, and Inmate Osazuwa was sitting down on the

14  lower bunk looking out of the back window.

15  Q.   When the cell door is closed, can you see into the cell

16  in any other way except through the little window?

17  A.   No other way.

18  Q.   And just for clarification, the little window on the cell

19  door, can you describe where it's located?

20  A.   It's the middle -- I'm sorry -- the wood door, and it's

21  on the edge where the hinges are.

22  Q.   And it has a rectangular-shaped object in the door?

23  A.   Yes.

24  Q.   What did you do after you looked into the defendant's

25  cell?

1   A.   I unlocked the door.

2   Q.   And then what did you do?

3   A.   I walked in.

4   Q.   What did you see when you walked in?

5   A.   The inmate was kneeling down on the lower bunk looking

6   out.

7   Q.   If you could look at Exhibit 11.  Do you recognize this

8   exhibit?

9   A.   Yes.

10   Q.   What is it?

11   A.   It would be the actual bunks that the inmates sleep on.

12   Q.   And did that look like the defendant's bunk set up that

13   day?

14   A.   Yes.

15   Q.   And where was he sitting or kneeling?

16   A.   On the lower bunk.

17   Q.   And what was he doing?

18   A.   He was looking out of that rectangular window.

19   Q.   To the right of the exhibit?

20   A.   Yes.

21   Q.   What did you do next?

22   A.   I was going to tell him what he was there for, what the

23   lieutenant had told me to tell him.

24   Q.   And you entered the -- you were in the cell at this

25   point?

1   A.    Yes.

2   Q.    Did you close the cell door after you walked in the cell?

3   A.    No.

4   Q.    What happened next?

5   A.    Inmate Osazuwa, he turns around, still kneeling on the

6   lower bunk, and he waved kind of like to tell me to come

7   further in, and he said there was something flying in his

8   room.

9   Q.    Then what happened?

10  A.    He -- I remember he turns around.  He gets up from the

11  lower bunk, and he stands up in front of me.

12  Q.    All right.  And what was he doing at that time?

13  A.    He just stood there for a little while, a few seconds,

14  and I remember him raising his hands.

15  Q.    In any particular fashion?

16  A.    To me they were confrontational.

17  Q.    And why is that?

18  A.    Just the way he was standing.

19  Q.    Why would him raising his hands be confrontational?

20  A.    He didn't look like he wanted to talk.

21  Q.    Was he doing anything in particular with his hands?

22  A.    He put them into like a fist.

23  Q.    What did you do after you saw that?

24  A.    I hit my body alarm.

25  Q.    What's a body alarm?

1  A.   It's an emergency beacon we have on our radio that we

2  carry.

3  Q.   What does it do?

4  A.   It rings to our control center, which is the brain of the

5  institution, and they know exactly where you're at, and they

6  send the help.

7  Q.   And who is the help?

8  A.   It would be anybody that's available in the institution.

9  Q.   Do all staff need to respond to the body alarm?

10  A.   Yes.

11  Q.   Why did you hit the body alarm?

12  A.   Because I felt threatened.

13  Q.   What happened after that?

14  A.   I remember Inmate Osazuwa walking -- lunging forward and

15  striking with two punches.

16  Q.   Did any of the punches hit you?

17  A.   Yes.

18  Q.   Do you recall where?

19  A.   I believe it was in the back of my head.

20  Q.   And why is that?

21  A.   Because I had a bad stinging sensation.

22  Q.   Do you remember which hand he punched with first?

23  A.   No, I do not.

24  Q.   What did you do after you got hit?

25  A.   I didn't want to get hit any longer, anymore.  So I ended

1   up giving him a bear hug.

2   Q.   Okay.  How were you -- let me back up.

3        Were you successful in giving him a bear hug?

4   A.   Yes.

5   Q.   And how were you standing when you did that?

6   A.   I was standing with my left and right foot parallel to

7   me.

8   Q.   Okay.  Side by side?

9   A.   Side by side, yes.

10  Q.   Were you facing the defendant?

11  A.   Yes.

12  Q.   Based on your memory, who was taller?

13  A.   He was.

14  Q.   And at that time, how would you compare your weights?

15  A.   I believe I was heavier than he was.

16  Q.   Were you the same weight you are now?

17  A.   No.

18  Q.   What's different about you now?

19  A.   I've gained some weight.

20  Q.   You were lighter then?

21  A.   Yes.

22  Q.   Were you much heavier than the defendant?

23       MR. GOLDMAN:  Your Honor, objection to lack of

24  foundation.

25       THE COURT:  I don't know what "much heavier" means.

1      Let's see if we can narrow it down.

2      Q.   BY MS. SANNEMAN:  Would you say that you weighed

3      approximately the same at that time?

4      A.   No.

5      Q.   I'm sorry.  When I say "you," I mean you and the

6      defendant.  Did you weigh approximately the same at that time?

7      A.   No.

8      Q.   What happened next?

9      A.   When I bear hugged him?

10     Q.   After that.

11     A.   I lost my footing, and I fell back with Inmate Osazuwa.

12     Q.   When you say you fell back, how far back did you fall?

13     A.   I fell all the way back on my back.

14     Q.   Where were you at that point?

15     A.   I believe I was still in the cell.

16     Q.   Were you on the ground?

17     A.   I was on the ground, yes.

18     Q.   What do you remember about falling to the ground?

19     A.   I don't remember too much because I believe I ended up

20     blacking out.

21     Q.   Do you remember anything before you went down?

22     A.   Besides bearing hugging him, no.

23     Q.   What was the defendant's cell floor made of?

24     A.   I'm sorry?

25     Q.   What was the defendant's cell floor made of?

1    A.    Concrete.

2    Q.    Did you eventually awake?

3    A.    Yes.

4    Q.    And what did you see when you awoke?

5    A.    I remember he was above me, and he was spitting at me.

6    Q.    What did you do after that?

7    A.    I got back on my feet.

8    Q.    And then what happened?

9    A.    I remember pinning him on the wall.

10   Q.    And why did you do that?

11   A.    So I could restrain him until help arrived.

12   Q.    Did help arrive?

13   A.    Yes.

14   Q.    Who came?

15   A.    It was -- the first officer that was there was Officer

16   Parker.

17   Q.    What did he do?

18   A.    He took control of the inmate.

19   Q.    How did he do that?

20   A.    By restraining him.

21   Q.    Was anyone else in the cell besides you and the

22   defendant, was anyone else in the cell when Officer Parker

23   arrived?

24   A.    No.

25   Q.    Was anyone else in the cell when the defendant assaulted

1    you?

2    A.    No.

3          MR. GOLDMAN:   Your Honor, I'm going to object to

4    assuming facts not in evidence with respect to the assault,

5    and that's a legal conclusion that the jury has to decide.

6    And I move to strike that answer.

7          THE COURT:   Overruled.  And the jury will be the

8    ones to decide whether that's what actually happened.

9    Q.    BY MS. SANNEMAN:   What did you do after Officer Parker

10   arrived to control the defendant?

11   A.    They escorted me to the triage room.

12   Q.    Where was that?

13   A.    That is next to the sally port.

14   Q.    When you were in the bear hug with the defendant, how did

15   you fall backwards?

16   A.    I believe when he launched forward, I lost my footing,

17   and I fell straight back.

18   Q.    Looking at Exhibit 12, do you recognize that photo?

19   A.    Yes.

20   Q.    What is it?

21   A.    It would be a cell.

22   Q.    And what is hanging on the left-hand side of the

23   photograph there, if you can see?

24   A.    On the wall?

25   Q.    Yes.

1    A.    It would be a jacket.

2    Q.    Okay.  Can you make out what color that jacket is?

3    A.    It looks green to me.

4    Q.    And please take out Exhibit 14.  Do you recognize that

5    photograph, or actually there are three photographs there,

6    aren't there?

7    A.    Yes.

8    Q.    Do you recognize them?

9    A.    Yes, I do.

10   Q.    What are they?

11   A.    It would be me, a front picture of me, and my hands.

12   Q.    The picture on the upper left-hand corner, is that a fair

13   and accurate depiction of what your hand looked like that day?

14   A.    Yes.

15   Q.    And does your hand always look like that?

16   A.    No.

17   Q.    What's the difference?

18   A.    It looked swollen.

19   Q.    Is there any redness there?

20   A.    Yes.

21   Q.    And in the picture on the bottom left, is that also a

22   fair and accurate depiction of what your hand looked like that

23   day?

24   A.    Yes.

25   Q.    And the bottom right, the same?

1   A.   Yes.

2   Q.   Do you recall that your hand was hurting after the

3   incident with the defendant?

4   A.   Yes.

5   Q.   Do you recall hurting your hand?

6   A.   Yes, I do.

7   Q.   How did you do that?

8   A.   When I fell backwards.

9   Q.   Specifically how?

10  A.   When I fell backwards, I let my hand go, and I hit the

11  concrete.

12  Q.   Looking at Exhibit 15, do you recognize that photograph?

13  A.   Yes.

14  Q.   What is it?

15  A.   It would be the back of my head.

16  Q.   What is that a picture of specifically?

17  A.   The laceration.  The back of my ear.

18  Q.   And did -- when did that occur?

19  A.   Either when he hit me or when I hit on the floor.  I

20  don't recall.

21  Q.   Did it occur sometime during the incident?

22  A.   Yes.

23  Q.   What is -- what are the dots on your shoulder there?

24  A.   That would be blood.

25  Q.   Did you get blood anywhere else?

1  A.   I had some on the front of my shirt.

2  Q.   You said you went to the -- it was the triage room after

3  the incident?

4  A.   Yes.

5  Q.   What happened there?

6  A.   I was examined by the physician assistant, Mrs. Castillo.

7  Q.   Were you in any pain at that time?

8  A.   Yes.

9  Q.   What type of pain?

10  A.   I had a really, really bad headache, and my hand was

11  hurting.

12  Q.   Anything else?

13  A.   I had pain in my rib also.

14  Q.   At that time were you bleeding?

15  A.   Yes.

16  Q.   Did Ms. Castillo treat any of your injuries?

17  A.   Yes, she did.

18  Q.   What did she do?

19  A.   She put my right hand in a soft splint, and I believe she

20  cleaned up my cut, my laceration.

21  Q.   What did you do after you saw Ms. Castillo?

22  A.   I was -- I went up to the lieutenant's complex.

23  Q.   Why did you do that?

24  A.   So I could write a report.

25  Q.   Were you asked to write a report?

1   A.   Yes.

2   Q.   Who asked you to do that?

3   A.   It was Operations Lieutenant Sigala.

4   Q.   What were you to write this report about?

5   A.   About the incident.

6   Q.   And when you say incident, what do you mean?

7   A.   When I was assaulted, what had basically transpired.

8   Q.   Did you actually write a report, physically write it?

9   A.   No.

10   Q.   Why not?

11   A.   The report was typed.

12   Q.   Why was that?

13   A.   Because we normally type our reports.  And I didn't do it

14   because my hand was -- was in a soft splint.

15   Q.   Did someone else type the report for you?

16   A.   Yes.

17   Q.   How did that person get the information to put in the

18   report?

19   A.   She was sitting right next to me, and I told her what had

20   occurred.

21   Q.   Did you want to dictate this report at that time?

22   A.   No.

23   Q.   Why not?

24   A.   Well, what I wanted to do was go to the hospital to be

25   evaluated because that's what they recommended, that I go out

1    to the hospital.

2    Q.    Were you in a hurry then?

3    A.    Yes.

4    Q.    Why didn't you just write the report later?

5    A.    Because I wasn't allowed to.

6    Q.    Why not?

7    A.    I needed to write something about the incident while I

8    was there.

9    Q.    Did someone tell you that?

10   A.    It was Operations Lieutenant Sigala.

11   Q.    What did you do after you wrote the report?

12   A.    I was driven to White Memorial Hospital.

13   Q.    Who drove you?

14   A.    It was Officer Avila.

15   Q.    Where in White Memorial did you go?

16   A.    It was the emergency room.

17   Q.    What happened when you got there?

18   A.    I was examined by a doctor.  They gave me a CAT scan and

19   an X ray of my right hand.

20   Q.    Did they do anything else for your right hand?

21   A.    They put me in a hard splint.

22   Q.    Did they give you any medicine of any kind?

23   A.    Yes.

24   Q.    What did they give you?

25   A.    They gave me Vicodin with codeine.  I'm sorry.  It was

1    Tylenol with codeine.

2    Q.    How long did you wear the splint?

3    A.    I believe I had it for a little over a month.

4    Q.    Did you at any point see a doctor again that day?

5    A.    Yes, I did.

6    Q.    Why was that?

7    A.    When I got home, my wife noticed the cut on the back of

8    my head would not stop bleeding.  It was just constantly

9    bleeding.

10   Q.    And so what did she do about that?

11   A.    She drove me to Presbyterian Hospital.

12   Q.    What happened when you got there?

13   A.    Again, I went into the emergency room, and I told the

14   doctor what had occurred.  He looked at my laceration and

15   actually giggled a little bit and said he didn't know why

16   White Memorial didn't put stitches on it, because I did

17   require stitches.

18   Q.    Did you get stitches at that hospital?

19   A.    Yes, I did.

20          MS. SANNEMAN:  Your Honor, may I have a moment?

21   Thank you.

22          I have nothing further at this time.

23          THE COURT:  Cross-examination?

24          MR. GOLDMAN:  Your Honor, may we approach?

25          **(SIDEBAR CONFERENCE HELD.)**

1          MR. GOLDMAN:  Your Honor, I'm wondering if it's

2     possible if we would break for the day.  My technical guy had

3     a malfunction with the computer, and the exhibits got loaded

4     wrong, and he says he wants to go back to the office and

5     reload the computer, and it will just make everything go

6     faster.

7          THE COURT:  Faster is good.

8          MR. GOLDMAN:  And it will be faster, your Honor.

9          THE COURT:  What do we have on tap for tomorrow?

10    You're going to wrap it up, obviously.

11         MS. SANNEMAN:  Yes.  Parker, all of my witnesses can

12    be on and off tomorrow.

13         THE COURT:  Okay.  I think we'll be done.  All

14    right.

15         Ladies and gentlemen, we're going to recess for the

16    day.  Tomorrow we'll go from 8:00 in the morning until 2:00,

17    and if Ms. Plato hasn't instructed you about how to get back

18    into the jury room, she will do that before you leave today.

19    So don't talk about the case.  Don't form or express any

20    opinions about the case until it's finally submitted to you.

21    You are ordered to return by 8:00 A.M. tomorrow, and you're

22    ordered to have a good evening.

23         THE CLERK:  All rise.

24         **(WHEREUPON THE JURY WITHDRAWS.)**

25         THE COURT:  Officer Medina, you are ordered to

1    return tomorrow by 7:45.  You are excused.

2           Anything we need to discuss before the jury comes in

3    tomorrow?

4           MS. SANNEMAN:  I don't believe so, your Honor.

5           MR. GOLDMAN:  I don't think so, your Honor.

6           THE COURT:  All right.  We'll see you all at 7:45

7    tomorrow morning.

8           MR. GOLDMAN:  We'll be here.

9

10          (Proceedings concluded at 4:10 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **C E R T I F I C A T E**

4

5

6        I hereby certify that pursuant to Title 28,

7  Section 753 United States Code, the foregoing is a true and

8  correct transcript of the stenographically reported

9  proceedings in the above matter.

10            Certified on May 4, 2010.

11

12

13        _____
         **MARK SCHWEITZER, CSR, RPR, CRR**
14        Official Court Reporter
         License No. 10514

15

16

17

18

19

20

21

22

23

24

25